UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert Lee PRESTON, Stanley Burr Meaker, Robert Mathias Bromley, Defendants–Appellants.

Nos. 79–1553, 79–1554 and 79–1555.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 16, 1980.

Decided Nov. 17, 1980.

Ronald C. Barker, Salt Lake City, Utah, for defendant–appellant, Preston.

Tom Jones, Salt Lake City, Utah, on brief for defendant–appellant, Meaker.

Richard F. Bojanowski, Salt Lake City, Utah, for defendant–appellant, Bromley.

Francis M. Wikstrom, Salt Lake City, Utah, (Ronald L. Rencher, U. S. Atty. and James R. Holbrook, Asst. U. S. Atty., Salt Lake City, Utah, on brief), for plaintiff–appellee.

Before BARRETT and DOYLE, Circuit Judges, and TEMPLAR,* Senior District Court Judge, District of Kansas.

WILLIAM E. DOYLE, Circuit Judge.

*Introduction*

In this mail fraud prosecution the above defendants seek reversal of their convictions on each of the several counts contained in the indictment.

The allegations are that Robert Lee Preston was president of Constitution Mint, Inc., the corporation which was engaged in the business of selling silver and other precious metals to the public. Stanley Burr Meaker was Vice President and a Member of the Board of Directors; Robert Mathias Bromley was Director of Marketing.

Also alleged is that the defendants devised and intended to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises; and that the defendants did knowingly cause to be delivered by mail certain matters for the pur-

* Honorable George Templar, District of Kansas, sitting by designation.

pose of executing and attempting to execute the scheme to defraud.[1]

The scheme, according to the allegations in the indictment, was to make false representations to customers and prospective customers, such as that Constitution Mint had a one million dollar performance bond which would insure all of its customers against financial loss; that the corporation had an inventory of silver sufficient to cover all orders purchased by customers; that the corporation, Constitution Mint, was financially solid, stable and reliable; that the corporation had obtained one of the richest mining districts on record containing several billion ounces of silver and gold. The scheme also included fraudulent failure to disclose to prospective customers:

1. That Constitution Mint, Inc. was only negotiating for the purchase of the one million dollar ($1,000,000) bond.

2. That the corporation did not have a silver inventory sufficient to cover customer purchases; that the corporation was in severe financial difficulty beginning in approximately January of 1974.

Counts Two through Fourteen describe specific transactions with named individuals describing individual sales in very substantial amounts of money and use of the mails for the execution of the several sales.

The pertinent elements, here, of a mail fraud violation are the devising, or intent to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, and secondly, the placing in the mails of any mail matter for the purpose of executing such scheme or artifice.

*Failure to Deliver the Silver Following Sales*

The individual defendants conducted business through Constitution Mint, Inc., a corporation. The business activities started in June 1973. Preston and Meaker were the principal corporate officers. Preston was president and chairman of the board; Meaker was initially responsible for marketing, and later became vice president responsible for developing the Mint's mining interests. Bromley took over the responsibility for marketing after joining the corporation in January 1974.

For a time after the commencement of the business until October 1973 there existed a system of inventory control which avoided the financial problems which developed after October. After that the corporation was selling silver and other products which it did not have in its inventory and did not have sufficient cash to obtain. The period of delay in delivery increased as replacements were not full and complete in terms of maintaining an inventory which allowed prompt delivery after the sale. First there was a seven or eight week delay in delivery of orders to retail customers and a shortage of about 80,000 ounces of silver which became apparent in December 1973 and early January 1974. When they discovered the shortage of silver, so the defendants say, the price had risen from about $2.00 an ounce to about $3.00 an ounce. Meanwhile the financial statement had been prepared for December which showed a profit based upon the continued selling of orders. Actually there was a deficit.

1. The applicable statute, 18 U.S.C. § 1341 provides as follows:

Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

A substantial portion of the profits appearing in the December statement was distributed to the shareholders in the form of draws. In addition to the dividends, Preston and Meaker received salaries and refunds of cash contributions which they made in the corporation. There is testimony that Meaker and Preston were advised of the financial problems in December. About this time Preston left the corporation and started travelling around the country giving lectures on investment opportunities in silver. He was kept advised, however, during the next four months as to the company's activities.

In January 1974 a new financial statement was made which showed a deficit. The previous "first in first out" inventory control system was resumed, but a further loss was suffered as a result of dealing in the commodity futures market. An outside audit reported to the company in April 1974 showed that as of January 1974 there existed unfilled orders amounting to $2,750,000. At the same time the company had an inventory of $2,000,000 worth of silver. They continued to operate in the same manner, that is, they filled the orders that had existed in January 1974 but did so by using money from new orders, which new orders could not be filled. So their way of doing business was, so to speak, one of robbing Peter to pay Paul.

The production consultant, so-called, and the auditors advised the officers to convert the profits which had been drawn by them on the books to loans owed by them to the company. Preston was the only one who paid back any of the amount drawn and his effort was limited to $5,000. The other stockholders did not pay back any money, and eventually the $160,000 in loans was written off. Some progress was realized in February 1974 in bringing the deliveries up to date. Preston returned to the company in April 1974 from his lecture tour. Production had again fallen behind deliveries. In April Preston communicated with the board members, instructing them to keep the financial problems confidential. He also met with the production department to discuss the priorities of selling orders. This was called a hot list.

In April 1974 a lawyer advised the Board of Directors to make full disclosure of the financial problems to the customers, to stop selling silver without having it in inventory and to pay back the cash drawn off by the shareholders as refunds of cash contributions. The Board members were told that criminal sanctions could result from their activities. Based on this advice Preston paid $12,000 on Meaker's behalf, but no other money was returned.

The company continued to operate during the summer of 1974, during which period it sought to make up the deficit. However in August they were served with a cease and desist order of the Utah Attorney General. As of July 31, 1974 there was a deficit of $2,300,000.

### Obtaining Mining Properties

One aspect of this operation was to seek mining properties, and a contract was actually signed to purchase several claims in mining areas of Utah and a lease was executed involving claims in the same area. Both the contract and the lease were later forfeited. A part of the sales process involved representations that the Mint had obtained one of the richest mining districts on record containing several billion ounces of silver and gold. In truth the closest the company came to doing any mining was to consider processing tailings around the abandoned mining properties.

### The So-Called Performance Bond

One of the representations which was made pertained to a $1,000,000 performance bond for the protection of customers. At most the company negotiated for such a bond but never actually had one. Financial statements showing a sound financial position were required, and the agent for Lloyds of London was never able to get the statements from the company. No formal application for such a bond was ever made and no such performance bond was ever in effect.

*The Contentions of the Defendants*

Preston's contentions on appeal are:

1. That the verdict and judgment was not supported by the evidence.

2. That the court erred in refusing to charge the jury in writing and in failing to give tendered instructions.

3. That the court erred in admitting evidence that showed other crimes.

4. That the court erred in allowing the prosecuting attorney to speak in an inflammatory manner in closing argument.

Defendant Meaker contends:

1. That the evidence was insufficient.

2. That the court erred in denying the defendant's motions for mistrial.

3. That the court erred in its instructions to the jury.

The defendant Bromley's contentions are substantially similar to those of Preston and Meaker although he claimed that numerous exhibits were received but only a few of these had any relevancy as far as he was concerned and that he should have been granted a severance.

I.

*The Question of Sufficiency or Insufficiency of the Evidence*

▄ The arguments under this heading involve claims that the defendants were unaware of the fact that the customers were being given false information. These defendants maintained that they acted in good faith at all times; they believed that the information that was being given out was true.

*Preston* is shown to have kept abreast of what was going on in the company even during the period that he was engaged in lecturing. After he resigned as president and chairman of the board Preston started on the lecture circuit and continued to maintain contact with the company. He participated in the seminar for the sales people and gave representations to them. These representations are set forth in the indictment. Preston was also aware of the final audit report which showed the severity of their financial problem. He supervised the revision of the sales brochure which contained the misrepresentations. Preston allowed the bonds that were prepared for the sales persons to be photographed and included in the brochure in order to mislead purchasers on the subject of the million dollar performance bond. The sales brochure contained statements that the company had adequate silver and that the mining properties had been obtained. In the form letters issued by the company Preston placed his signature under false statements. Furthermore the same misrepresentations were made in lectures to the public.

As to *Meaker*, the evidence shows that he was fully aware of the financial condition of the company, and that he participated in making misrepresentations at seminars which were held for the sales people. One such representation that he made was that the company owned several mines, some of which were in operation and others of which were ready for operation. Meaker made other statements concerning the mining property which were false in that they led listeners to believe that the properties were functioning when in fact the parties were not even negotiating for their purchase. Meaker was fully aware of the audit report of April 1974 which disclosed the shortages of the unfilled orders. Meaker cannot claim any good faith reliance on the opinions of the geologists because he made the representations before the Utah property was in operation and even before any contract for purchase or for leasing had been made final.

After he became manager for sales in January 1974 *Bromley* became informed of the financial problems. He instructed the sales people about what to say in response to complaints. He was also expected to deal with complaints from customers and from some of the sales people. He told them to tell the complainers that the company already owned the mines and that the mines would be in operation in ten days. He also gave instructions as to the million

dollar bond. The implication from the instructions was that a copy of the bond would be sent to the sales people to be used as a selling aid. Bromley prepared a newsletter published by the company for the sales people. This newsletter stated that the bond had been obtained, that there was plenty of silver, and even as late as May 24, 1974 that the mines would be in operation within ten days and that the smelter and mill would also be in operation. Bromley conducted seminars in which he repeated the same information.

From the above brief summary there can be no question but that the three defendants were involved in the scheme together and that they had full knowledge of the scheme to defraud and participated in it.

The trial court's denial of the defendants' motion for acquittal was a correct ruling.

## II.

### The Question Whether the Court Erred in its Charge to the Jury

■ The defendant Preston's main contention is not that the court misinstructed the jury but that it erred in failing to give his tendered instruction. The tendered instruction submitted on behalf of Preston is as follows:

"In determining the guilt or innocence of the defendants you are not to consider loss or financial hardship suffered or claimed to have been suffered by the alleged victims. Questions of liability of the defendant to the alleged victims for losses which they may have sustained are matters to be considered and determined in a separate civil lawsuit if such a lawsuit should be filed. Those matters are not to be considered by you in arriving at your verdict in this case. Your verdict in this case will not affect the outcome of a civil lawsuit should such a lawsuit be commenced."

The object of this instruction was that the evidence might cause the jury to be misled whereupon it would convict the defendant based upon civil losses sustained by customers of the corporation and not on criminal misconduct. We disagree. It would confuse the jury to withdraw civil losses from its consideration and that is what the tendered instruction would require. The losses suffered by the customers are an integral part of the transactions. Moreover it would detract from the proof of the scheme if the customers' losses were not included in the evidence. The contention that the jury's verdict could be, in the absence of the tendered instruction, based on sympathy for the customers' losses is nothing but speculation. The instructions which the court gave clearly delineated the jury's duty. The judge outlined all of the issues which the jury was required to consider. It set forth the elements of the offense; the jury was admonished that the government had to prove each of the requirements beyond a reasonable doubt and there was no necessity for introducing subject matter such as that which was here tendered.

From a reading of the instructions as a whole we are convinced that there was not room for confusion or misconception on the part of the jury. The instructions were complete, precise and very understandable. Besides that the trial court repeated the more important aspects of the applicable law so as to avoid misunderstanding on the part of the jury.

### Can Information In Business Documents be Imputed to Employees?

■ The defendant Bromley argues that information in some of the documents containing false representations could not be imputed to him because he was an employee and not an officer or a director of the Mint. Bromley argues that the trial court's failure to give a limited instruction on this subject could have allowed an inference to be drawn that such evidence was admissible against defendant Bromley. This contention is not well grounded. Mail fraud in which two or more defendants engage in the execution of a scheme to defraud, is similar to a conspiracy. Once the existence of the scheme has been established by independent evidence the statements and acts of one defendant in furtherance of the

scheme are admissible against the others. This principle is discussed in *United States v. Krohn*, 573 F.2d 1382, 1387 (10th Cir. 1978). *Krohn* was a mail fraud case in which the several defendants were, as in the present case, officers of the corporation, and in one instance, president, manager and secretary of the corporation which sought to sell distributorships for distribution of various products. The defendants in the *Krohn* case made contentions similar to those which are advanced by the defendants here, namely that they were not bound by statements of their co–defendants. This court ruled against them, however, saying that in mail fraud cases the participants in the scheme are bound by the acts and statements of the participating co–defendants. In *Krohn*, we noted the difficulty of proving fraudulent intent by direct evidence, and recognized that inferences of fraudulent intent must be drawn from the acts of the parties. At the same time we took notice of the requirement that each defendant must be shown to have participated in the scheme. Also we recognized that evidence of the acts and statements of parties in the fraudulent enterprise must necessarily be admitted out of order and often prior to the proof of the participation in the scheme by the objecting defendant "so long as the foundation is subsequently laid". 573 F.2d at 1387; *Beckwith v. United States*, 367 F.2d 458, 460 (10th Cir.).

We have heretofore set forth the more important parts of the evidence which show that Bromley, Preston and Meaker were active participants in the execution of the scheme to defraud. The court's instructions defined the words "scheme" and "artifice" as the same listed in the statute as including any plan intended to deceive others and to obtain by false pretenses, representations or promises money or property. The court stressed that to act with intent to defraud means to act knowingly and with a specific intent to deceive and for the purposes of causing financial loss to another or bringing about financial gain to oneself.

The court further told the jury that an act is done knowingly if it is done voluntarily and intentionally and not because of mistake or accident or other innocent reasons.

Finally the court advised the jury "The purpose of adding the word 'knowingly' is to insure that one will not be convicted for an act done because of mistake or accident or other innocent reasons".

\* \* \* \* \* \*

■ Based upon the extensive activities of the defendant Bromley, the director of marketing, we conclude that he was not prejudiced by the receipt in evidence of the activities of the company and he was not entitled to a limiting instruction distinguishing between employees and officers. The court did instruct the jury that a fraudulent scheme had to be found and that Bromley, as well as his co–defendants, had to be found to have participated in that fraudulent scheme.

### Did the Court Err in Failing to Instruct the Jury In Writing?

■ The defendant Preston advanced an argument that the court erred in failing to instruct the jury in writing or in failing to segregate the exhibits according to the defendants against whom each was received. The court refused the request to give the instructions in writing, saying that the jury could ask that the instructions be reread if they so desired. The judge added that he had not, in a quarter of a century, sent written instructions to the jury. The jury did request written instructions during its deliberations. Preston argues that the jury's request evidenced inability on the jury's part to understand the instructions. Such is not, however, a valid argument since the jury did not make any request for specific instructions nor did it state that it was confused. Whether the jury is allowed to have written instructions depends upon the trial court's exercise of discretion. *Ortle v. United States*, 370 F.2d 719 (10th Cir. 1967), *cert. denied*, 387 U.S. 943, 87 S.Ct. 2075, 18 L.Ed.2d 1329. In refusing the jury's request Judge Kerr made it clear that if the jury had a specific instruction that they wished to have reread, he would respond to that request.

■ The other assignment of error, namely that the exhibits should have been segregated so as to limit their admissibility to one particular defendant, is also without merit because, as we have pointed out above, we are here considering concerted action on the part of the defendants.

### III.

*The Question of Whether the Trial Court Erred in Receiving Evidence that Showed Other Crimes*

■ It has long been recognized that while evidence of other crimes is not admissible to prove the character of a person, such evidence may be admissible for other purposes such as proof of motive, authority, intent, reparation, plan, knowledge, identity or absence of mistake or accident. Rule 404(b), Federal Rules of Evidence. In order for such evidence to be probative under the rule, it is required to outweigh resulting prejudice to the defendant. Generally it is within the trial court's discretion to receive or reject such evidence.

■ One of the transactions which the defendants find objectionable in this case involves the receipt of evidence concerning silver which was stored by the defendants for customers. It was being held in trust for its customers but was unpacked in July 1974 and was placed on the shelves in the vault and was commingled with the company's silver while sales representatives were touring the company and afterwards it was repacked. Particular objection is made to the fact that customers and sales people were led to believe that the silver that was held in trust was part of the company's stock. Preston argues that he suffered invalid prejudice from the receipt of this evidence. . . . We conclude, however, that the trial court did not err in receiving this evidence. Its probative value was plain. The covering up of the shortage which existed was an essential part of the scheme. The evidence in question had a tendency to establish the requisite knowledge; secondly it was related to the charge and the act was relevant from a time standpoint. This evidence established that the defendants knew that the company was in serious financial condition and they intended to conceal this fact from their salesmen and from the customers. There was also evidence that when a shortage occurred that the customers' stored silver was actually used. In sum, we disagree with the arguments which are advanced regarding all of the defendants' contentions of evidence of other crimes. All of the evidence so offered was relevant to showing a scheme to defraud.

Also probative of the existence of a scheme was the misrepresentation that Mint had a million dollar insurance policy issued by Lloyds of London for the protection of its customers. This was designed to persuade the customers that their investment was safe and to give them a false sense of security. Like the other evidence it showed the existence of a scheme to defraud.

### IV.

*Did the Remarks Which the United States Attorney Made in Closing Argument About Defense Counsel Constitute Prejudicial Conduct Calling for the Declaration of a Mistrial?*

■ The statements of the United States Attorney relied on by Preston as personal attacks upon the attorney prejudicial to Preston are as follows:

"Mr. Barker (the defendants' lawyer) is a very able lawyer. He is a master at diversionary tactics. Throughout the whole trial and in his argument itself * *.

Mr. Barker: 'Your Honor, I object to counsel's attack. This is uncalled for and unreasonable and prejudicial'.
The Court: Sustained."

The remarks of the United States Attorney were personal and therefore we do not give any approval to them. At the same time we take notice of the fact that the trial court sustained the objection thus showing its disapproval. The timely objection and the sustaining of the objection certainly detracts from a conclusion of prej-

udice. *See United States v. Aqueci*, 310 F.2d 817, 99 A.L.R.2d 478 (2nd Cir. 1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); *Homan v. United States*, 279 F.2d 767 (8th Cir. 1960), *cert. denied*, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960).

Quite apart from the fact that the trial court promptly sustained the objection, and considering the fact that the remarks are not all that offensive, we must reject Mr. Preston's contention.

### V.

*Did Bromley Suffer Substantial Prejudice as a Result of the Trial Court's Denial of his Motion for Continuance and the Trial Court's Denial of his Motion for Severance?*

■ Just prior to Bromley's taking the stand as a witness in his own defense his counsel was advised that there was a possibility that Bromley would be indicted on charges growing out of the facts that were being tried. Counsel for Bromley requested a continuance but this motion was denied. The argument advanced was that the denial of the request was error which had a constitutional dimension. The matter of granting a continuance was purely discretionary. Whether it would have affected the decision of Bromley to take the stand or not is unknown from the record and abuse of discretion is not apparent on any other basis.

### Was There Error in Preston's Sentencing?

Finally, Preston argues that the trial court increased his sentence after the original pronouncement. At first Preston was sentenced to two years in prison and fined $1,000 on the first Count. On Counts 2, 3, 4, 5, 6 and 7 he was fined $1,000. On Counts 8, 9, 10, 11, 12 and 13 he was fined $1,000. The imposition of sentence growing out of Count 14 was suspended. Preston was placed on probation for five years with the condition that he was not to engage in any promotional activities. After sentencing Bromley and Meaker the court recessed and then reconvened ten minutes later in order to make a correction by inserting the word "each" between each of the Counts 2 to 13 in which a $1,000 fine had been imposed.

Preston maintains that the first oral sentence at which he was present should govern.

\*    \*    \*    \*    \*    \*

■ It is settled law that when the original sentencing process is construed to be a continuing one, where the defendant has not yet left the courtroom or is returned to the courtroom the same day, the trial judge may alter the sentence to correct a misstatement. *United States v. Davidson*, 597 F.2d 230 (10th Cir. 1979). Therefore, the trial court's correction of the oral sentence was valid, and that sentence must be followed.

■ When the written judgment was transcribed, however, the two–year sentence on Count 1 of the indictment was imposed concurrently with a two–year sentence on each of Counts 2 to 7. Further, the written judgment did not mention the trial courts' oral statement that he would recommend that the defendant be incarcerated in a minimum security prison. We conclude that this was a clerical mistake.

This variance cannot be approved and on remand it is ordered that it be corrected by removing the prison sentences on Counts 2 through 7. The trial judge's oral statement that he would recommend that each defendant be incarcerated in a minimum security prison appears in the transcript but was not included in the judgment. It must on remand be included.

### Conclusion

■ It is true that good faith is a defense in a mail fraud case. Good faith is employed to mean a genuine belief that the information being sent or given is true. Good faith does not mean an ultimate hope or even faith that eventually the project will come out even. Nor does it mean a hope or belief that the money which is being obtained will eventually be put back. Finally, good faith does not include efforts

to prevent the failure of a company, which efforts are marked by false representation concerning it. See *United States v. Westbo*, 576 F.2d 285 (10th Cir. 1978); *United States v. Beitscher*, 467 F.2d 269 (10th Cir. 1972); *Sparrow v. United States*, 402 F.2d 826 (10th Cir. 1968).

We have considered all of the points raised by the defendants and have been unable to find merit in any of them or, for that matter, in the case as a whole. The thread or thrust discernible in the defense which the defendants have sought to assert is first, that the defendants did not know that the information which they were communicating to the public was false and secondly, that they acted at all times in good faith. There is ample evidence in the record that these three defendants not only knew that the representations were false, but that they fostered the giving of such false facts. This was for the purpose of either persuading members of the public to make purchases or to maintain the status quo with those who had already made purchases and who were becoming apprehensive.

Accordingly the cause is remanded for the corrections last mentioned only. Otherwise the judgments are all affirmed.