Sherlyn **KONSTANTOPOULOS**, Plaintiff,

v.

**WESTVACO CORPORATION**, Defendant.

Civ. A. No. 90–146–SLR.

United States District Court,
D. Delaware.

June 30, 1994.

---

Thomas Herlihy, III, and Allison E. Hare, of Herlihy, Harker & Kavanaugh, Wilmington, DE, for plaintiff.

Donald E. Reid, and Andrea L. Rocanelli, of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SUE L. ROBINSON, District Judge.

Plaintiff Sherlyn Konstantopoulos filed suit against defendant Westvaco Corporation ("Westvaco") in 1990 alleging, *inter alia,* that she was subjected to sexual harassment, sexual discrimination, and sexual assault by employees of Westvaco, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*[1] This Court has

---

1. The original complaint also asserted two state law tort claims for alleged intentional infliction of emotional distress and loss of consortium. (D.I. 1, Counts III and IV) An amended complaint was filed on March 7, 1991, which added a new state law tort claim for alleged assault and battery by plaintiff's co-workers. (D.I. 33, Count V) Partial summary judgment was entered in favor of Westvaco on the state law claims on

jurisdiction of the claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e–5(f)(3). The case was tried by the Court, sitting without a jury, between August 24 and August 31, 1993. Following are the Court's findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### The Parties

1. Plaintiff Sherlyn Konstantopoulos is a citizen of the State of Delaware, residing at 304 North Union Street, Wilmington, Delaware. (D.I. 173 at 4, ¶ A; D.I. 213)

2. Defendant Westvaco is a Delaware corporation doing business in the State of Delaware. Westvaco operates a folding carton manufacturing plant in Newark, Delaware ("the plant"). The cartons manufactured at the plant are printed paperboard containers for consumer products. At all relevant times, Westvaco was an employer as defined by Title VII in that it employed more than 15 people and was engaged in an industry affecting commerce. (D.I. 173 at 4, ¶¶ B, C, D; D.I. 213)

### Employment History

3. Plaintiff graduated from Wilmington High School, Wilmington, Delaware, in 1976. (D.I. 203 at 26; Plaintiff's Exhibit, "PX," 5)

4. She thereafter obtained her first full-time job in a plastic factory as a plastic trimmer. (D.I. 203 at 28) She does not recall how long she was employed in such capacity.

5. In October 1977, plaintiff was involved in an automobile accident. (D.I. 203 at 32) According to the medical records related to such accident, as of June 1979, plaintiff had not "returned to work since the date of the accident...." (Defendant's Exhibit, "DX," 6) Plaintiff was "fully recovered" from said accident by September 1987. (D.I. 203 at 32)

6. Plaintiff married her husband in July 1978. (D.I. 203 at 30) Plaintiff testified at trial that she next worked part-time for her husband's cash register company, keeping his books and ledgers and filing papers. (D.I. 203 at 31)

June 4, 1993, leaving only the Title VII claims to

7. For a twelve-to-fifteen month period in 1984–85, plaintiff and her family lived in Athens, Greece, in order to care for her mother-in-law. (D.I. 203 at 33)

8. Upon returning to this country, plaintiff obtained employment at United Manufacturing, Newport, Delaware, for a number of months; plaintiff worked on electronic boards (soldering relays and connecting wires). (D.I. 203 at 34–5)

9. Plaintiff then obtained employment at Laidlaw Corporation, New Castle, Delaware, as a "feeder" for a machine that painted and/or packaged coat hangers. (D.I. 203 at 35–6)

### Employment at Westvaco

10. Plaintiff commenced employment at Westvaco in September 1987. (D.I. 203 at 43)

11. Plaintiff's employment application indicated that she graduated from Wilmington High School in 1976 with a grade B average; plaintiff in fact did not know her grade average. (D.I. 203 at 44; PX 5) Plaintiff indicated that from 1974 to 1984, she was employed by "Interstate Cash Reg. Co." "repairing electronic boards," "soldering, inventory," leaving this employment because it "closed." (PX 5)

12. Because she believed herself "fully recovered," plaintiff did not relate on the Pre–Employment Medical History form that she had been involved in an automobile accident and had been hospitalized in connection therewith in 1977. (D.I. 203 at 47–9; PX 6) Neither did plaintiff relate that she had a learning disability, in that she does not understand diagrams. (D.I. 210 at 89–90)

13. Plaintiff worked for approximately four weeks as a "helper" in Westvaco's "Finishing" Department until she was laid off for lack of work; specifically, plaintiff packed finished products into boxes for shipping. (D.I. 203 at 49–50)

14. Plaintiff applied for unemployment benefits. (D.I. 203 at 50)

15. Plaintiff returned to work in Westvaco's Finishing Department in July 1988, where she worked as a helper for approxi-

be tried. (D.I. 165)

mately nine months, until April 1989, doing packing and sorting. (D.I. 203 at 51)

16. In April 1989, plaintiff was "promoted" to "helper" in Westvaco's "Web" Department.[2] (D.I. 203 at 53–54)

17. The Web Department contained a single printing press that used large rolls of paper spliced together to create one continuous "web" of paper. (D.I. 203 at 11)

18. In 1989, the Web Department operated on the basis of "tours" which consisted of four twelve-hour days. (DX 56) There were seven to eight employees assigned to each tour: one operator, two assistant operators, and four or five helpers. (D.I. 208 at 15) The web operator was responsible for keeping the press running and producing a high quality product without color variation. (D.I. 210 at 104)

19. The web helpers were each assigned to one of four work stations: unwinder, delivery, packing, or robot.

20. The helper assigned to the unwinder was responsible for maintaining the supply of paper and ink for the press. (D.I. 210 at 135) The beginning of a new roll of paper had to be spliced to the end of an old roll to maintain a continuous flow of paper through the press. (D.I. 210 at 135) The ink fountains had to be monitored as well and filled with ink as necessary. (D.I. 208 at 25) A step-by-step procedure was written for trainees newly assigned to the unwinder. (D.I. 204 at 81)

21. One or two helpers were normally assigned to packing. The helpers packed the finished product into boxes for shipping, performing essentially the same functions as helpers in the Finishing Department. (D.I. 203 at 54–5)

22. The final stage of the web press operation involved the robot, a large mechanical arm that lifted the packed boxes and set them down on pallets. (D.I. 203 at 15) A descriptive instruction book was kept near the robot to explain the operation. (D.I. 211 at 183) The helper assigned to the robot picked up the pallets with a forklift and moved them to a station where a computer-operated conveyor picked them up. (D.I. 203 at 15; D.I. 208 at 7) The conveyor then transported the pallets to the warehouse where they were shrink-wrapped for shipping. (D.I. 208 at 7)

23. Plaintiff began working in the Web Department on April 7, 1989, on the "D" tour under foreman Ron Hurley. (D.I. 203 at 54; D.I. 208 at 77–8) For her first six days in the Web Department, plaintiff's co-employees were Matt Smolka, Mike Marshall, Ed Peterman, Tyrone ("T.J.") Mayfield and Carl Horkey. (D.I. 208 at 78; PX 39)

24. Under the union contract, plaintiff was considered a probationary employee in her new position and was given a 60–day period to learn her new duties or be reassigned to her original position. (DX 26A)

25. During her first tour in the Web Department, April 7–10, 1989, plaintiff was the only woman. (D.I. 203 at 54) The only training she received was from her foreman, Ron Hurley, who

> walked her through the department. I explained where the firearms are, what the different ... machines are and what they do, where the emergency stop buttons are, and then a tour through the break area and the canteen and the locker room, and explained how often she can have breaks and everything.
>
> And then I [took] her down to the— where we have the chemicals, explain the chemicals and what safety precautions should be taken, which ones you wear gloves for, and then show them the eye wash fountain, if you get something in your eyes.
>
> And then I introduced her to the crew. I also—in showing her the machine, I show pinch[ ] points and stuff to stay away from, dangerous areas.

(D.I. 208 at 78–9)

26. Plaintiff recalls only that she was assigned to packing this tour. (D.I. 203 at 54–

---

**2.** The Web Department is also referred to in the record as the "Web Press" and "Web Fed" De- partment. (D.I. 203 at 11)

5) She did not require training for this assignment. (D.I. 211 at 18)

27. Plaintiff was evaluated by her foreman at the conclusion of the tour; plaintiff's evaluation was consistent with that given any new employee. (D.I. 208 at 80; PX 14) Plaintiff did not inform her foreman, Ron Hurley, that the work environment was hostile at this time. (D.I. 211 at 27)

28. On April 15 or 16, 1989, plaintiff was working in the delivery area about 25 feet away from co-worker Mike Marshall, with whom she had had no prior contact. (D.I. 203 at 60; D.I. 211 at 18–19, 21) The press was running and was loud. (D.I. 211 at 19–21) Marshall yelled: "Sherri, look at this." Plaintiff looked up, "saw white" and Marshall's "pants' flaps open"; plaintiff turned her head immediately and covered her eyes. (D.I. 203 at 60; D.I. 211 at 23–4) Plaintiff continued working and did not discuss this experience with anyone. (D.I. 211 at 24–5)

29. On April 16, 1989, the second day of her second tour, plaintiff injured her hand when she "stuck her hand" into running machinery. (D.I. 208 at 80–1) She was taken to an emergency room and did not return to work until the next day; she stayed for only an hour on April 17, 1989, when she was permitted to go home. (D.I. 208 at 81)

30. Plaintiff did not tell anyone at Westvaco in April 1989 that she considered the work environment in the Web Department to be hostile. (D.I. 211 at 27)

31. Plaintiff did not work from April 17 until May 12, 1989, due to her injured hand. (D.I. 211 at 28) Plaintiff worked May 12, 1989, the end of a tour. She had four days off, worked four days from May 17 through May 20, 1989, had four days off, then worked four days from May 25 through May 28, 1989. (D.I. 211 at 28)

32. Plaintiff's crew members in May included three new trainees, Gladys Hamilton, Pat Moretz, and Phil McDonald. (D.I. 211 at 28; PX 39)

33. There is no evidence of record regarding the specific tasks assigned to plaintiff or the training she received on May 12 or during the May 17–20, 1989 tour.

34. There is evidence of record that during the last two tours in May, Ed Peterman, rather than provide substantial assistance to plaintiff on assignments such as the unwinder and "the machine that tapes the boxes," gave nonresponsive, sarcastic answers to plaintiff's questions "quite a few times." (D.I. 203 at 56–9, 66; D.I. 204 at 84; D.I. 211 at 30) For instance, plaintiff testified that once she asked for Mr. Peterman's help with a lid on a drum. He responded: "Aren't you liberated?" (D.I. 203 at 67) Similarly, upon plaintiff's informing Peterman that there was a malfunction on "the machine that tapes the boxes," Peterman told plaintiff "the tools [are] there ... go fix it [yourself]," even though plaintiff had not been trained to do so. (D.I. 203 at 58) Peterman threatened on multiple occasions to send plaintiff back to the Finishing Department if she could not perform in the Web Department. (D.I. 203 at 57, 66; D.I. 211 at 86–88, 161)[3]

35. There is evidence of record that plaintiff was assigned to the unwinder under the tutelage of co-worker T.J. Mayfield during the May 25–28 tour. (D.I. 208 at 83; PX 14)

36. There is also evidence of record that plaintiff's foreman, Ron Hurley, personally demonstrated to plaintiff the proper technique for filling the press fountains with ink on the unwinder. (D.I. 208 at 84–5) According to Mr. Hurley, this demonstration followed his observing plaintiff's attempting to fill the press fountains by scooping the ink out of the can with her hands, rather than using the appropriate tool. (D.I. 208 at 84–5) Hurley further testified that plaintiff had problems setting up the splicer on the unwinder, necessitating special training under Mr. Mayfield's tutelage. (D.I. 208 at 84) Plaintiff also had problems with "the machine that tapes the boxes." On one occasion, plaintiff "had the cases taken backwards, and when the robot picked them up, the bottom just fell out" and the cartons went all over the floor. (D.I. 208 at 87)

(D.I. 210 at 73; D.I. 211 at 161)

---

3. It is undisputed, however, that Mr. Peterman did not have the authority to transfer plaintiff.

37. Plaintiff's work was evaluated at the end of every tour by her foreman, Ron Hurley. (D.I. 208 at 79) Plaintiff's evaluations for the May 17–20 and May 25–28, 1989 tours reflect below average ratings in several categories of work, including knowledge, quantity and quality of work, and judgment and common sense. (PX 14) Plaintiff was evaluated as "occasionally" showing initiative and getting along well with her co-workers. (PX 14)

38. Plaintiff did not tell anyone at Westvaco in May 1989 that she considered the work environment in the Web Department to be hostile. (D.I. 211 at 30)

39. Glenn Hawkins, the plant's personnel manager, spoke with Pat Moretz in May 1989. Ms. Moretz indicated at the time that she wanted to be transferred to the Finishing Department because she was not familiar with the type of machinery and equipment used in the Web Department and was having some trouble picking up the work. (D.I. 204 at 80; D.I. 210 at 72) Mr. Hawkins assured her that, as a new employee, she wasn't expected to learn the job "instantly, that's what the probationary period was for." (D.I. 210 at 72) At Mr. Hawkins' request, Ms. Moretz agreed to give the work in the Web Department another chance. (D.I. 204 at 80; D.I. 210 at 72)

40. Plaintiff worked three tours in June 1989 (June 2–5, 10–13, and 18–21) with the same crew with whom she had worked in May. (D.I. 211 at 31; DX 56; DX 58)

41. During these June 1989 tours, several incidents occurred which were interpreted by plaintiff to have sexual overtones and be directed towards her. These incidents, which involved Mike Marshall, were not witnessed by the other women on plaintiff's crew; plaintiff did not report any of these incidents to Westvaco at the time they occurred. (D.I. 211 at 32–8)

a. Mike Marshall held a wrench near his private parts and "wiggle[d] it around" (D.I. 203 at 70–71);

b. Mike Marshall made "thrusting movements" with his hips towards plaintiff (D.I. 203 at 61–2); and

c. While plaintiff was at a table getting a clean rag for cleaning the press, Mike Marshall walked behind plaintiff and said: "I would like to have that" (D.I. 203 at 63–4).

42. As with the prior incident involving Marshall, plaintiff observed the incidents for "an instant" and walked away. (D.I. 211 at 33–7)

43. Plaintiff's evaluations for the June 2–5 and 10–13 tours were unchanged from the May evaluations. (D.I. 208 at 86; PX 14)

44. Sometime before June 21, 1989, plaintiff arranged to meet Frank Alcamo, the plant manager. She related to Mr. Alcamo several incidents involving Marshall (the "wrench" and "exposure" incidents) and Peterman (the "drum" incident and threatening to send her back to the Finishing Department). (D.I. 203 at 74)[4]

45. On June 21, 1989, plaintiff met twice with Westvaco management. Initially, plaintiff met with Glen Hawkins, the personnel manager, Bernie McKinley, supervisor of the Web Department, and Bob Whited, the union president. (D.I. 203 at 77–9) She repeated to them the information given to Mr. Alcamo. (D.I. 203 at 79–80; D.I. 208 at 47) She also complained that her foreman, Ron Hurley, was not training her. (D.I. 210 at 48) Plaintiff then left the room. (D.I. 203 at 82)

46. Messrs. Hawkins and McKinley then reconvened a meeting with Frank Alcamo and Ron Hurley. (D.I. 210 at 44–5) These men met with Mike Marshall and Ed Peterman. Mike Marshall denied the allegations lodged against him by plaintiff. (D.I. 208 at 53; D.I. 210 at 73) Ed Peterman denied threatening plaintiff or anyone else and indicated that plaintiff "would not take instruction." (D.I. 210 at 73) Westvaco's "EEOC policy" was read to both Marshall and Peterman, along with the admonition that "increasingly severe disciplinary measures" would be taken if any further sexual harass-

---

4. Plaintiff testified that she also told Mr. Alcamo about an incident which allegedly occurred in June 1989 with co-employee Matt Smolka. (D.I. 203 at 67–8) The Court, however, does not cred-it plaintiff's testimony regarding this incident. Neither does the Court credit her testimony regarding the drawing of a penis on the floor of the Web Department. (D.I. 211 at 39–43)

ment complaints were made against either of them. (D.I. 210 at 73–4)

47. Messrs. Hawkins, McKinley, Alcamo, and Hurley also met with Gladys Hamilton on June 21, 1989. Gladys Hamilton indicated at the time that she had had some problems with Ed Peterman in the Web Department during May and June 1989. (D.I. 210 at 71) At trial, Ms. Hamilton testified that on several occasions Ed Peterman would demonstrate a task once and state that if the trainees did not learn the task, they would be sent back to the Finishing Department. (D.I. 211 at 167–68)

48. The final meeting held on June 21, 1989, was with plaintiff and Messrs. Alcamo, Hawkins, Hurley, McKinley, and Whited. The focus of this meeting was plaintiff's work performance and her complaints of inadequate training. (D.I. 208 at 58–60; D.I. 210 at 51) Plaintiff agreed to be transferred to a new tour, commencing the next day, June 22, 1989. (D.I. 203 at 90–3)

49. The foreman of the tour on June 22, 1989, was Larry Cahall. (D.I. 203 at 94) Although Mr. Cahall was informed of the transfer on June 21, 1989, he was not informed of the circumstances underlying the transfer. (D.I. 205 at 75–7) Mr. Cahall knew plaintiff had been a Westvaco employee for several months and assumed that she was trained. (D.I. 203 at 94–5; D.I. 205 at 76, 86)

50. Plaintiff worked the following tours with Cahall as her foreman: June 22–25, June 30–July 2, July 8–11, July 16–19, July 24–27, August 1–4, August 9–12, August 17–20, and August 25–27, 1989. (DX 56)

51. The following individuals comprised plaintiff's crew members on the above tours: John Hall, Dave Fender, Jerry Walkup, Gary Keener, Anthony Cordill, Russ Brumit, and Greg Games. Louise Stevenson sometimes worked on the crew as well. (D.I. 211 at 48–9)

52. On one day during the June 22–25, 1989 tour, plaintiff was working on the unwinder machine when the ink blurred. The operator, John Hall, repeatedly blamed plaintiff, even though the problem ultimately was traced by co-employee Dave Fender to a computer error. (D.I. 207 at 65–7)

53. Starting with the June 30–July 2, 1989 tour, plaintiff received extra training. (D.I. 208 at 18–19, 30–1) Plaintiff's co-workers Fender, Walkup, and Stevenson were helpful in this regard. (D.I. 211 at 48–9)

54. Sometime in July 1989, plaintiff found a note taped to the unwinder: "Sherry doesn't need help, she needs a babysitter." (D.I. 207 at 73–4) Plaintiff did not report this incident to anyone at Westvaco. (D.I. 207 at 74)

55. On or about July 19, 1989, plaintiff discovered that her uniform locker had been damaged, which locker was identifiable as being plaintiff's. (D.I. 207 at 128; D.I. 211 at 53) Plaintiff reported the locker to Pete Bond, a union representative, and to Bill Petlock, a foreman on another tour. (D.I. 207 at 131–134) Four lockers in fact had been damaged, all located in a hallway outside the restrooms and the lunchroom. (D.I. 208 at 27; D.I. 210 at 12–13; D.I. 211 at 53–4) Shortly thereafter, plaintiff found trash in her locker. (D.I. 211 at 56–7)

56. On July 24, 1989, plaintiff reported the damaged locker to Cahall. (D.I. 211 at 56–7; PX 44) Cahall reported the incident to his supervisor, Bernie McKinley, who issued a warning to employees that anyone found guilty of vandalism would be disciplined. (PX 23, PX 44) Plaintiff's locker was repaired. (D.I. 211 at 57)

57. On or about August 8, 1989, plaintiff found the following written on the clipboard kept by the unwinder: "Sherry gives the best head in Westvaco, but she's ugly." (D.I. 207 at 76; D.I. 211 at 171; PX 67) Plaintiff reported the incident to Mr. Cahall; without knowing the specific content of the note, he responded that it would be difficult to "catch" the perpetrator and that she should erase the writing or throw the clipboard away. (D.I. 205 at 80–1; D.I. 208 at 35; PX 44)

58. Sometime between July 23 and August 28, 1989, plaintiff alleges that the following incidents took place involving co-worker Greg Games:

a. He stated to plaintiff that she "belong[ed] in a porno magazine" (D.I. 207 at 126);

b. He placed "his finger underneath [plaintiff's] bottom (D.I. 203 at 97–8);

c. "He grabbed [plaintiff] by the neck and he pushed [her] down towards his stomach.... He said, 'I would like to kill you'" (D.I. 203 at 98);

d. He called plaintiff a "dumb f---" when an operation in which she was involved went wrong (D.I. 207 at 180);

g. He commented to a co-worker that plaintiff had a "d--- - sucking smile" (D.I. 207 at 122).

59. Plaintiff did not report any of these incidents to anyone at Westvaco at the time they occurred. (D.I. 207 at 123, 127, 181; D.I. 211 at 58)

60. Plaintiff testified, however, that she was "upset," "afraid," "hurt," "humiliated," and "diminished" by the various incidents. (D.I. 203 at 61, 62, 64, 67, 97–8; D.I. 207 at 72, 74, 84)

61. Plaintiff was evaluated by foreman Cahall at the end of every tour. Plaintiff's knowledge of work, quantity of work, quality of work, ability to learn new duties and judgment and common sense were evaluated consistently as below average; plaintiff's skill on the unwinder was evaluated on multiple occasions as unsatisfactory. (PX 14) Plaintiff received a verbal warning publicly from Mr. Cahall on August 27, 1989, after plaintiff had committed multiple mistakes on the unwinder. (D.I. 208 at 25, 28–32; PX 44)

62. August 27, 1989 was the last day plaintiff worked that summer. (D.I. 211 at 63)

63. Plaintiff did not miss any work during the period April 15, 1989 through August 27, 1989, due to the harassment experienced by her. (D.I. 211 at 63)

64. On September 2, 1989, plaintiff gave Mr. Cahall a note from her doctor advising that she should be assigned a "light duty job" for three to four weeks due to "job and home-related stress." (D.I. 208 at 32; D.I. 211 at 63, 66; PX 44; PX 61) Westvaco requested additional information from plaintiff regarding the type of light-duty work she could perform. (PX 61) Plaintiff never supplied the information and instead supplied a second note dated September 14, 1989, which read as follows:

To whom it may concern:

Ms. Sherlyn Konstantopoulos has been under my care since 8/21/89 for the treatment of severe work induced stress. Subsequently she has been seen on 8/31/89 and 9/14/89. There appears to be some improvement but she was advised to remain off work for another 3–4 weeks.

Sincerely,

Costas A. Terris, M.D.

(PX 61)

65. Plaintiff did not inform anyone at Westvaco of the cause of the "job" "related stress" before she left work on August 27, 1989, or thereafter.

66. Plaintiff returned to work, able and willing, on October 30, 1989. (D.I. 211 at 66–8) Plaintiff elected to take a layoff and did not return until April 16, 1990, when she was recalled to work. (D.I. 211 at 71–2; PX 8) During the period October 30, 1989 to April 16, 1990, plaintiff indicated to Westvaco that she was ready, willing, and able to work. (D.I. 211 at 71) Plaintiff also walked the picket line at Westvaco while the union was out on strike between December 4, 1989 and January 28, 1990. (D.I. 211 at 71–2)

67. Plaintiff worked in the Web Department her first tour, April 16–20, 1990, with Ron Hurley as her foreman. (D.I. 211 at 72–3; DX 5C)

68. Plaintiff did not share with anyone at Westvaco any apprehension about returning to work. (D.I. 207 at 182)

69. During her first tour, plaintiff broke the electric eye on the conveyor by misplacing a skid. Rather than help her, co-worker Russ Brumit informed foreman Ron Hurley of the problem; Hurley publicly chastised her. (D.I. 207 at 173–74; D.I. 211 at 75) Plaintiff packed the rest of the shift and received a poor evaluation from Hurley. (D.I. 207 at 176–78; D.I. 211 at 74)

70. During the next tour, April 23 and 24, 1990, plaintiff was temporarily transferred to the Finishing Department for lack of work in the Web Department. (D.I. 211 at 73–4) None of plaintiff's co-workers harassed her during this two-day period. (D.I. 211 at 76)

71. On April 25, 1990, plaintiff was assigned to packing as a helper in the Web Department on Larry Cahall's tour. (D.I. 207 at 184; D.I. 211 at 76–7) Plaintiff informed Cahall of her apprehension about the work environment. (D.I. 207 at 184)

72. However, because Cahall was bound by the union contract, he was required to transfer plaintiff because she was the person in the Finishing Department with the most seniority who had worked in the Web Department previously. (D.I. 205 at 89; D.I. 208 at 33) Cahall assured plaintiff that he would be available in his office if she needed him. (D.I. 208 at 33) He also spoke to the crew and made it clear that he would tolerate no harassment of plaintiff. (D.I. 205 at 89–90) In addition, Cahall made frequent visits to the Web Department entering through a different door each time, and he spent more time than he normally would in the area. (D.I. 205 at 90) Plaintiff made no complaints at all to Cahall during that day. (D.I. 208 at 33)

73. Plaintiff alleges that on April 25, 1990, co-workers Mike Marshall and Ed Peterman "squinted their eyes ... and shook their fist[s]" at her; these men neither spoke to nor touched plaintiff. (D.I. 207 at 185–86; D.I. 211 at 78) Plaintiff did not report their conduct to anyone at Westvaco. (D.I. 211 at 78–9)

74. Also on April 25, 1990, co-worker Anthony Cordill threw plaintiff's lunch away. (D.I. 207 at 191–92; D.I. 211 at 79–80) Upon informing Mr. Cordill of the incident, Mr. Cordill stated that he had accidentally thrown away the paper bag containing plaintiff's lunch. (D.I. 211 at 80–1) It is not clear from the record whether plaintiff's name was on the bag. (D.I. 211 at 80)

75. Plaintiff completed her shift and left without speaking to anyone from Westvaco. (D.I. 208 at 33; D.I. 211 at 79)

76. On April 26, 1990, plaintiff presented the following note to her foreman, Cahall:

To whom it may concern:

Ms. Konstantopoulos has been under my care for the past several months for the treatment of severe work related anxiety. She has now been referred to a local psychiatrist to continue therapy and has also been advised to stay off work for an additional 6–8 weeks.

Sincerely,

Costas A. Terris, M.D.

(PX 61)

77. When Cahall told plaintiff to go home and call Glen Hawkins, the personnel manager, the next day, plaintiff asked, "Am I fired now?" (D.I. 208 at 34–35)

78. Plaintiff has not worked at Westvaco, or anywhere else, since April 26, 1990; nor has she looked for work. (D.I. 211 at 74, 84)

**EEOC Charges**

79. On July 21, 1989, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). (D.I. 211 at 55) Plaintiff reported to the EEOC that her locker had been damaged in retaliation for her complaints against her former co-workers Marshall and Peterman. (D.I. 207 at 136, 141; D.I. 211 at 55–6; PX 50C) Plaintiff did not allege to the EEOC at this time that anyone on Mr. Cahall's shift had harassed her in any way. (D.I. 211 at 56)

80. On September 11, 1989, plaintiff supplemented her complaint filed with the EEOC by reporting that a "derogatory sexual remark" was written about her on a clipboard (see PX 67) and the inaction of foreman Cahall; plaintiff also reported a verbal warning given by foreman Cahall for plaintiff's failing "to bring the tape down far enough" when plaintiff was not trained to perform this function properly. (PX 53B) Plaintiff claimed that she suffered "anxiety and stress resulting in los[t] time from work and extensive medical bills." (PX 53B) The content of the derogatory sexual comment was not disclosed. (PX 538)

81. The EEOC filed two "Notice[s] of Right to Sue" on December 28, 1989, having found that it would be "unable to complete its

administrative process within 180 days from the filing of the charge." (PX 52; PX 55)

82. On May 15, 1990, plaintiff filed the following averments with the EEOC:

On April 26, 1990, I was scheduled to work in the Web Press area. The previous day I had made a grievance about an unfair evaluation. Mike Marshall and Ed Peterman both work in that area. I presently have a court action pending against the two of them and Westvaco. I believe that I was transferred to the Web Press area as retaliation for my grievance.... Attorney Thomas Herlihy, III, will incorporate this incident in the action pending in U.S. Dist. Court, Del.Case # 90–146.

(PX 56)

### Westvaco's Employment Policies

83. Westvaco posted an "equal employment opportunity" announcement at all relevant time periods at the employee entrance (adjacent to the Finishing Department) and in the plant's main lobby. (D.I. 210 at 29; PX 25)

84. Annually, Westvaco published its "equal employment opportunity" policies in memoranda distributed to employees with their salary paychecks. (D.I. 208 at 48; D.I. 210 at 33–7; PX 17; PX 20) These memoranda declared in relevant part as follows:

The purpose of this memorandum is to reaffirm our commitment to equal employment opportunity and to assure thorough communication of this policy....

Equal employment opportunity is a sound business practice to which we are committed. The company strives to provide a fair and a healthy work environment, free from bias of any kind.

Equal employment opportunity extends to all aspects of the employment relationship including hiring, assignment, training, performance appraisal, compensation, promotion, and transfer....

Consistent with Westvaco's respect for the rights and dignity of individuals, it is our policy to maintain a work environment supportive of personal growth and maximum individual contribution. Accordingly, sexual or other harassment is forbidden.

Unwelcome sexual advances, physical or verbal conduct of a sexual nature or any other conduct tending to create a hostile work environment is strictly against company policy....

If you have any questions or concerns about equal employment, or, most importantly, if you believe that you have been discriminated against or harassed in violation of this policy, we strongly encourage you to immediately alert your local personnel department or where appropriate the division or corporate personnel departments.

(PX 20)

85. The bargaining agreements effective during the relevant time periods contained provisions prohibiting discrimination on account of race, creed, color, sex, age, or national original of any employee. (D.I. 210 at 37–40; DX 26A; DX 26B)

86. During the relevant time periods, Westvaco had no written guidelines regarding the proper procedure to be followed in handling complaints about harassment. (D.I. 208 at 50; D.I. 210 at 40–1)

87. During the relevant time period, Westvaco did not sponsor any seminars, meetings, or educational sessions on the topic of sexual harassment. (D.I. 208 at 49; D.I. 210 at 14–15)

### Medical Findings

88. On April 18 and 25, 1989, and again on May 23, 1989, plaintiff saw her family physician, Costas Terris, M.D., in connection with the injuries sustained when she inserted her right hand in the printing press. (PX 61)

89. On July 3, 1989, plaintiff was treated in the emergency room at Wilmington Hospital complaining of "a rash that was itchy on her exposed forearms" and "her face was itchy and swollen." (D.I. 211 at 107; DX 76) The rash on plaintiff's forearms had been apparent for approximately two weeks; the rash on her face appeared on the day of her hospital visit. (D.I. 211 at 109)

90. The treating physician in the hospital emergency room, Dr. Sutherland, observed "scattered erythematous papules" over plain-

tiff's arms. Dr. Sutherland also "noticed some swelling, mostly around the left eye." (D.I. 211 at 107–108)

91. Plaintiff's condition was diagnosed as "acute allergic dermatitis" or contact dermatitis. (D.I. 211 at 108)

92. When asked about possible exposure to any substance, plaintiff responded that she had possibly been exposed to sawdust. (D.I. 211 at 108) Plaintiff did not mention any exposure to chemicals or harsh soaps or to any anxiety related to the work place. (D.I. 211 at 109)

93. On August 21, 1989, plaintiff was treated by her personal physician Dr. Terris for symptoms associated with "atopic eczema hand, of eye lid, face, forearm. . . ." (PX 61) Although plaintiff generally related her symptoms to stress and anxiety, Dr. Terris "thought it was just sort of a contact dermatitis. . . ." (D.I. 207 at 11) Dr. Terris noted "severe anxiety" as a cause for "exacerbat[ing]" and "intensify[ing]" the skin rash. (D.I. 207 at 12)

94. On August 31, 1989, Dr. Terris noted that the "skin rash [was] better" with the medication. (D.I. 207 at 12; PX 61) Dr. Terris "[a]dvised light duty job for 3–4 weeks." (PX 61)

95. By September 14, 1989, the skin rash was clear. Dr. Terris testified that it was on this visit that plaintiff, for the first time, divulged that her anxiety was "work-related." (D.I. 207 at 14) Dr. Terris advised plaintiff not to return to work until October 31, 1989. (PX 61) Dr. Terris prescribed an anti-anxiety drug. (D.I. 207 at 14)

96. Dr. Terris next saw plaintiff on November 20, 1989. Plaintiff, who was "nervous and depressed," further divulged to Dr. Terris that her condition was caused by "work-related misconduct by her co-workers. . . ." (D.I. 207 at 16; PX 61)

97. Plaintiff next saw Dr. Terris on April 19, 1990, complaining of "skin reaction both arms, recurrent itching, . . ." (PX 61) Dr. Terris "again" diagnosed plaintiff's condition as "contact dermatitis both arms and face. . . ." (D.I. 207 at 18; PX 61)

98. On her April 26, 1990 visit, plaintiff complained of anxiety and for the first time related her anxiety to sexual harassment at work. (D.I. 207 at 19; PX 61) At this point, Dr. Terris referred plaintiff to a psychiatrist and advised plaintiff to "stay off work [for an] indefinite period" due to what he considered to be a "deep-seeded problem." (D.I. 207 at 19–20; PX 61)

99. Plaintiff did not see Dr. Terris again until November 27, 1992, when she complained of numbness or pain in her left chest and arm. Dr. Terris "did not treat the palpitation . . . because it was purely due to the anxiety." (D.I. 207 at 21–3)

100. Plaintiff last saw Dr. Terris on August 6, 1993, complaining of loss of weight, inability to sleep, depression, fatigue. (D.I. 207 at 24) Dr. Terris observed that plaintiff was "withdrawn . . . almost paranoid, fearful. . . ." (D.I. 207 at 24)

101. Dr. Sacre first saw plaintiff on May 1, 1990. At that time, plaintiff related "that at work there was sexual harassment, physical threats and mental abuse." (D.I. 197 at 7) Dr. Sacre prescribed a "low dose" of an anti-depressant. (D.I. 197 at 8)

102. On June 1, 1990, Dr. Sacre increased the dose of the anti-depressant and additionally prescribed an anti-anxiety medication. Plaintiff was unable at this time to "do what you consider the normal functions of a mother or housewife. . . ." (D.I. 197 at 9–10)

103. In addition to the medication prescribed, Dr. Sacre saw plaintiff every four to five weeks at least through 1990. (D.I. 197 at 8; but see D.I. 197 at 20)

104. When Dr. Sacre attempted to arrange therapy with another doctor, plaintiff insisted on his attending the session; Dr. Sacre declined, telling plaintiff that he didn't "want to babysit." (D.I. 197 at 29)

105. Plaintiff acknowledged to Dr. Sacre that she thought she had some learning disabilities. (D.I. 197 at 36)

106. Dr. Sacre opined that the litigation at bar is a "major part" of her condition. (D.I. 197 at 46)

107. Dr. Sacre made the following diagnoses and related them to the sexual harass-

ment that plaintiff allegedly suffered at Westvaco: post-traumatic stress disorder, major depression, and generalized anxiety disorder. (D.I. 197 at 11, 16, 22)

108. The Court, for the most part, rejects Dr. Sacre's diagnoses. Based on a review of the record at bar and on the testimony of David E. Raskin, M.D., a psychiatrist who examined pertinent records and plaintiff on behalf of Westvaco, the Court finds insufficient evidence of record to support either Dr. Sacre's diagnoses of post-traumatic stress disorder or major depression. (D.I. 204 at 21–23, 31–33)

109. Based on a review of the record at bar and on the testimony of David E. Raskin, M.D., a psychiatrist who examined pertinent records and plaintiff on behalf of Westvaco, the Court finds Dr. Sacre's treatment of plaintiff to be consistent with diagnoses of mild dysthymia or depression and anxiety disorder. (D.I. 204 at 31)

110. According to Dr. Raskin, psychological testing of plaintiff, consistent with her medication and personal history, indicates that plaintiff was suffering from a pre-existing personality disorder, more specifically, "a schizo typal personality disorder with some paranoid features...." (D.I. 204 at 20, 53)

111. According to Dr. Raskin, plaintiff's working experience at Westvaco was a stressor. (D.I. 204 at 58)

112. According to Dr. Raskin, none of the diagnosed conditions—dysthymia, anxiety, personality disorder—are disabling. (D.I. 204 at 28–30)

**Economic Findings**

113. Plaintiff's wage rate for the period August 28, 1989 to October 31, 1989 was $8.40 per hour. (Joint Ex. 1)

114. Lost earnings and lost benefits for the period commencing August 28, 1989, through September 1, 1993,[5] related to plaintiff's claims of sexual harassment at Westvaco is calculated to be $86,368 ($74,146 + 17,322 = $91,468 − 5100 = $86,368). (D.I. 207 at 97–100, 114)

115. Future earnings and benefits for the three-year period commencing September 1,

1993, during which time plaintiff is alleged to require supportive psychotherapy and medical management before re-entering the job market in a non-stressful, minimum wage job, is calculated to be $77,888 ($58,311 + $19,577 = $77,888). (D.I. 207 at 101–104)

## CONCLUSIONS OF LAW

### Liability

1. Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1).

2. The Supreme Court has described Title VII's proscription against discriminatory employment practices as evincing

> "a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment.... When the workplace is permeated with "discriminatory intimidation, ridicule, and insult" ... that is "sufficiently severe **or** pervasive to alter the conditions of the victim's working environment," ... Title VII is violated.

*Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) at ——, 114 S.Ct. at 370 (emphasis added), *quoting Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) at 64–67, 106 S.Ct. at 2404–6.

3. As further explained by the Supreme Court in *Harris,*

> [t]his standard, ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury. As we pointed out in *Meritor,* "mere utterance of an ... epithet which engenders offensive feelings in an employee," [477 U.S. at 67, 106 S.Ct. at 2405], does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or

5. This period does not include those periods dur-

ing which plaintiff worked or was on strike.

abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality....

—— U.S. at ——, 114 S.Ct. at 370.

4. In determining whether an employer's work environment is "hostile" or "abusive," the Supreme Court in *Harris* instructed that "all the circumstances" be reviewed, including

the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* at ——, 114 S.Ct. at 371.

5. When examining a Title VII action for sexual harassment, the Supreme Court has stated that the EEOC Guidelines, codified at 29 C.F.R. § 1604.11, while not controlling upon the courts, are to be given persuasive meaning. *Meritor Savings Bank v. Vinson,* 477 U.S. at 65, 74, 106 S.Ct. at 2404–5, 2409. The EEOC Guidelines place an affirmative duty on the employer to take all steps necessary to prevent sexual harassment from occurring, including "affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned." 29 C.F.R. § 1604.11(f). The EEOC's goal of preventing sexual harassment in the workplace has been echoed by the Third Circuit in *Andrews v. City of Philadelphia,* 895 F.2d 1469 (3d Cir.1990), in which the Court stated: "We do not consider it an unfair burden of an employer of both genders to take measures to prevent an atmosphere of sexism to pervade the workplace." 895 F.2d at 1486. *Id.* at 1486.

6. To establish a claim against an employer for a hostile work environment, a plaintiff must show that:

a. She suffered intentional discrimination because of her sex;

b. The discrimination was so severe or pervasive that it altered the conditions of her employment and created a hostile work environment;

c. She subjectively perceived the work environment to be hostile;

d. A reasonable person would find the work environment to be hostile; and

e. The employer knew or should have known of the harassment and failed to take proper remedial action.

*See Harris,* —— U.S. at ——, 114 S.Ct. at 370. *See also, Andrews v. City of Philadelphia,* 895 F.2d at 1482.

7. In applying these factors to the totality of the circumstances evidenced at bar, the Court is mindful at the outset that plaintiff came to the work environment in Westvaco's Web Department burdened at the very least with little or no experience working with machinery and with a learning disability. The work environment into which she was placed by defendant Westvaco was not accommodating of such employment characteristics. Further, plaintiff's co-workers, primarily men, had not been specifically trained to recognize and, thus, avoid sexual harassment. Given this background, perhaps it is not surprising that the end result of plaintiff's employment experience at Westvaco was litigation.

■ 8. The first factor to be addressed is whether plaintiff was intentionally treated differently by her co-employees simply because she was a woman, keeping in mind that "[i]ntimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Andrews,* 895 F.2d at 1485.

There is no evidence of record that the harassing conduct of plaintiff's co-workers was not intentional. Because at least some of the conduct at issue was sexually explicit, it is fair to draw the conclusion that, by virtue of this conduct, plaintiff suffered intentional discrimination because of her sex.

It is evident from the record, however, that defendant did not in any way prepare its employees—male and female—to work in an environment where men were working for the first time with women and where women were working for the first time with machinery. This lack of training by defendant—from both a technical and personnel point of view—likewise was intentional and contributed to the intimidation and hostility directed at plaintiff because she was a woman.

■ 9. The question of whether the conduct alleged by plaintiff was so "severe" or "pervasive" as to create a hostile or abusive work environment is a difficult one under the circumstances evidenced at bar.

Certainly, plaintiff subjectively perceived the work environment to be hostile. However, her perceptions, the record indicates, were influenced by her relatively unsuccessful adjustment to the work responsibilities of the Web Department.

Looking to the factors cited by the Supreme Court in *Harris* to determine whether the workplace was objectively a hostile or abusive environment, it is perhaps helpful to differentiate between that conduct which was sexually explicit in nature and that conduct which was related to plaintiff's work performance. With respect to the former, plaintiff identifies only two co-workers whose conduct was sexually explicit—Mike Marshall (four incidents during a span of 21 days worked in April and May of 1989) and Greg Games (five incidents during a span of 29 days worked in July and August 1989). Additionally, the Court has identified at least one other incident which involved sexually explicit language directed at plaintiff, this occurring in August 1989 (the clipboard). With respect to the work performance conduct, over a span of some 56 days worked (April 15 through August 27, 1989), plaintiff alleges that multiple derogatory comments were made about her work performance. The record indicates, as to the frequency of the harassing conduct, that plaintiff was subject to such conduct on a fairly regular basis during the course of the relevant time frame.

As to the severity of such conduct, one can find examples of conduct more severe than that evidenced of record, where female employees were subjected to harassment over a period of years (versus 56 days) and which harassment included repeated instances of physically threatening and/or humiliating conduct. *See e.g., Harris,* — U.S. at — —, 114 S.Ct. at 369–70; *Andrews,* 895 F.2d at 1472–76; *Hansel v. Public Service Co.,* 778 F.Supp. 1126, 1128–30 (D.Colo.1991); *Morris v. American National Can Corp.,* 730 F.Supp. 1489, 1490–94 (E.D.Mo.1989), *aff'd in part* 952 F.2d 200 (8th Cir.1991). Nevertheless, plaintiff's testimony remains essentially undisputed on the record and evidences some physically threatening and/or humiliating discriminatory conduct.

10. The last factor to be addressed is whether the conduct at issue unreasonably interfered with plaintiff's work performance. Although plaintiff did not miss any work during the period April through August 1989 due to the conduct at issue, plaintiff alleges that her work performance was directly related to the discriminatory conduct alleged, i.e., the failure to train. The record supports plaintiff's position.

11. Having reviewed "all the circumstances," and although the circumstances at bar are not so egregious as in other cases, the Court concludes that a reasonable woman would find the conduct evidenced of record to be sufficiently offensive as to alter the conditions of her employment.

■ 12. The Court finds that defendant knew or should have known of the harassment and failed to take proper remedial ac-

tion during the period April 15 through August 27, 1989. Specifically, plaintiff complained to management about sexual harassment in June 1989; defendant's response at the June 21, 1989 meeting (reprimanding Marshall and Peterman and transferring plaintiff to another tour) was consistent with a view that plaintiff's complaints were credible. Yet defendant did nothing to ensure that plaintiff's "new" work environment would be any different from the one she was leaving. Plaintiff's new foreman, Larry Cahall, was not informed of plaintiff's complaints; he, therefore, did not formally address the matter of additional training for plaintiff on the machinery and never addressed at all any additional training for the crew regarding defendant's policy against sexual harassment. It is clear from the record that defendant generally failed to provide its employees with the information and mechanisms necessary to successfully effectuate its policies against discrimination. It is clear from the record as well that defendant specifically failed to remedy the hostile work environment encountered by plaintiff during the period April 15 through August 27, 1989.

■ 13. The Court declines, for several reasons, to extend the hostile work environment characterization past August 1989, however. First, plaintiff was "ready, willing and able" to return to work (without any further discussions with defendant regarding the work environment[6]) by October 1989, and continued to so affirm through April 25, 1990. Consequently, the incidents alleged by plaintiff in April 1990 are sufficiently removed in time to be considered independently from those occurring in 1989 and, considered independently, were neither severe nor pervasive enough to have created a hostile work environment. Finally, plaintiff's apparent attitude in April 1990, coupled with the Court's general disregard for her medical experts' testimony, leads the Court to the conclusion that plaintiff's inability to work in April 1990 and thereafter is not necessarily related to defendant's conduct.

■ 14. Plaintiff also seeks application of the doctrine of constructive discharge. To establish a claim of constructive discharge, a plaintiff must show objectively that her "employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887 (3d Cir.1984). *Accord, Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir.), *cert. denied*, ⸺ U.S. ⸺, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir.1992).

■ 15. Some of the factors commonly cited by employees who claim to have been constructively discharged include the following: a) whether the employee was ever threatened with discharge; b) whether the employer ever urged or suggested that the employee resign or retire; c) whether the employee was demoted or had her pay or benefits reduced; d) whether the employee was involuntarily transferred to a less desirable position; e) whether the employee's job responsibilities were altered in any way; f) whether the employee was given unsatisfactory job evaluations. *Clowes v. Allegheny Valley Hosp.*, 991 F.2d at 1161.

■ 16. Of these factors, plaintiff can only cite to unsatisfactory job evaluations. Additionally, plaintiff, before departing, did not explore any alternative avenues of employment with Westvaco. *Id.*

17. In sum, the Court concludes that the conditions of employment in April 1990, the period preceding plaintiff's departure, were not so intolerable that a reasonable person in plaintiff's shoes would have resigned.

### Damages

■ 18. Under Title VII, the Court may award back pay, reinstatement, or "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g). In fashioning relief under Title VII, the Court is mindful that the purpose of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimina-

---

**6.** Although defendant had notice of plaintiff's second EEOC charge in September 1989, only two incidents were described generally. (PX

53B) Moreover, plaintiff was not working at that point and did not do so for another six and a half months. (D.I. 210 at 69)

tion." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Specifically, victims of discrimination are entitled to relief sufficient to restore them "to a position where they would have been were it not for the unlawful discrimination." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976).

19. Since the underlying purposes of Title VII are to make the victim whole and deter future discrimination, a finding of a violation of Title VII presumptively entitles the victim to back pay and reinstatement. *Albemarle*, 422 U.S. at 422, 95 S.Ct. at 2373–4.

20. Given the Court's conclusions as to liability, the award of back pay is limited to $3,326.40 to reimburse plaintiff for the period September 2, 1989 until October 30, 1989 (D.I. 214 at 54), plus prejudgment interest at the legal rate.

21. Plaintiff argues that reinstatement is not feasible; the Court agrees. *Maxfield v. Sinclair International*, 766 F.2d 788 (3d Cir. 1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986).

22. In lieu of reinstatement, plaintiff requests an award of front pay. An award of damages for front pay is "an award for a reasonable future period required for the victim to reestablish her rightful place in the job market." *Goss v. Exxon Office Systems Co.*, 747 F.2d at 889. Pursuant to 42 U.S.C. § 2000e–5(g), however, it is appropriate for the Court to consider plaintiff's failure to mitigate damages in determining whether to award front pay and in what amount. *See Maxfield v. Sinclair International*, 766 F.2d at 796.

23. Generally a Title VII plaintiff's duty to mitigate damages requires her to use "reasonable diligence to find other … employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982). This Court has held that an employer successfully establishes that an employee has not properly mitigated her damages where the employer has demonstrated "that the employee has withdrawn from the employment market." *Tubari Ltd.,*

*Inc. v. NLRB*, 959 F.2d 451, 454 (3d Cir. 1992), cited in *Wooley v. Colonial School District,* C.A. No. 91–407–MMS, 1993 WL 431208 (D.Del. May 11, 1993) (D.I. 214, Ex. D).

24. Given the Court's conclusions as to liability and its general rejection of plaintiff's medical experts' testimony (which medical testimony plaintiff asserts as a legitimate reason for not seeking other employment), the Court finds that plaintiff failed to mitigate her damages and, therefore, an award of front pay is inappropriate.

## CONCLUSION

For the reasons stated, the Court concludes that, during the period April 15, 1989 through August 27, 1989, plaintiff was exposed to a hostile work environment about which the defendant knew or should have known but failed to correct by proper remedial action. Therefore, partial judgment shall enter in favor of plaintiff and against defendant consistent with this opinion.

An order shall issue accordingly.