**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 30 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

JOHN ABUAN,

       Plaintiff-Appellee/Cross-
       Appellant,

v.

LEVEL 3 COMMUNICATIONS,
INC.,

       Defendant-Appellant/Cross-
       Appellee.

Nos. 01-1471, 02-1015, 02-1029

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 00-WY-423-CB)**

---

Edward P. Lazarus (William A. Norris, L. Rachel Helyar and Jessica M. Weisel, with him on the briefs), of Akin, Gump, Strauss, Hauer & Feld, L.L.P., for Defendant-Appellant/Cross-Appellee, Level 3 Communications, Inc.

John R. Olsen, Olsen & Brown, L.L.C., Niwot, Colorado, for Plaintiff-Appellee/Cross-Appellant, John Abuan.

---

Before **SEYMOUR**, Circuit Judge, **HOLLOWAY,** Senior Circuit Judge, and **EBEL,** Circuit Judge.

---

**SEYMOUR**, Circuit Judge.

John Abuan brought this employment discrimination suit under 42 U.S.C. §§ 2000e, *et seq.* (Title VII), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 623, *et seq.* (ADEA) against his former employer, Level 3 Communications, Inc. Mr. Abuan, who is of Hispanic and Filipino heritage and was over fifty years of age at the time of the alleged discriminatory acts, asserted that he was subjected to national origin discrimination and retaliation in violation of Title VII and age discrimination in violation of the ADEA. The case was tried to a jury, which found in his favor and awarded back pay along with compensatory and punitive damages. On Level 3's post-trial motion, the district court reduced the back pay and damages but awarded front pay. Both sides appeal. We affirm in part, reverse in part, and remand for further proceedings on the amount of front pay and appellate attorney's fees.

# I

## BACKGROUND

In reviewing a jury decision, "we view the record in the light most favorable to the prevailing party and give that party the benefit of all reasonable inferences to be drawn from the evidence." *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1123 (10th Cir. 2003). Read in that light, the record reflects the following facts.

Level 3 is a telecommunications company that began operations around the time Mr. Abuan commenced working there on December 16, 1997. Mr. Abuan had previously been employed with Pacific Bell for over twenty-five years, acquiring experience in telecommunications, strategic and practical planning, project management, and network and data center operations. He was one of the first people hired at Level 3. He was given the position of team leader and project manager directing the development of the NetExpert network management system. His compensation was determined by his band level, a classification used by the company to determine salary range, bonus percentage, and the ability to acquire stock in the company. Mr. Abuan was placed in Band 5, and his initial salary was $100,000 a year. He was also eligible for a bonus of twenty-five percent upon achievement of target goals and stock options that would become valuable only if Level 3's capital stock outperformed Standard & Poor's 500 stock index.

Mr. Abuan presented testimony at trial from other employees who had worked with him on the NetExpert project and who had the technical ability to evaluate his performance. These witnesses testified that Mr. Abuan's work was exemplary, that there had never been any criticism of the project, and that the project had been implemented unusually quickly due in large part to the work of Mr. Abuan. The project was scheduled for completion in September 1998, and Mr. Abuan presented evidence that all goals were met on schedule. At the end of

1998, Mr. Abuan's performance was rated as completely satisfactory, resulting in a large salary increase and a twenty-five percent bonus. Mike Jones, the company's Chief Information Officer, reviewed and praised the team's work in front of the entire information technology department, describing NetExpert as an exemplar in information technology.

In March 1999, Mr. Abuan was informed by Rob Hagens, his new supervisor, that he was being removed from his position as team leader of the NetExpert project and given the lower title of individual contributor on a new and different project. Mr. Abuan presented evidence that his demotion under these circumstances was unusual and possibly unique. The managers responsible for making the decision to demote and move Mr. Abuan originally told him and others who questioned the decision that it was not performance-related.

Witnesses testified that Mr. Abuan's duties on NetExpert had to be divided up because no one person was able to replace him. The NetExpert position was originally filled by Tom Hoople and Jonathan Mitchell, both of whom had credentials inferior to those of Mr. Abuan. Mr. Mitchell had previously been Mr. Abuan's peer and was then thirty-three years of age, while Mr. Hoople, who had been working under Mr. Abuan, was thirty-four. The workforce at Level 3 was primarily under forty. One witness stated: "It is a young company [with] . . . a lot of kids, a lot of smart kids running around here with not a lot of senior direction."

Supp. App. vol. II, at 340-41.

After Mr. Abuan was assigned to his new position, he was excluded from meetings at which his presence was necessary to enable him to perform his job. When he questioned his immediate supervisor, Mr. Mitchell, about the situation, Mr. Mitchell took his duties away from him without explanation and suggested that Mr. Abuan begin looking for another job in the company. In May 1999, Mr. Hagens informed Mr. Abuan that as a result of his demotion he would be rebanded, and that his salary, bonus, and stock options could be reduced. When Mr. Abuan asked if the issue was his performance, Mr. Hagens assured him that it was not and that he was valuable to the company. Mr. Abuan subsequently discovered that while his salary remained the same, his stock options and bonus percentage had been reduced.

At this point Mr. Abuan decided that if perceived problems with his performance were not the reason for his demotion and the reduction in his compensation, discrimination may have played a part in his treatment. Accordingly, he first sent a memo to the Human Resources department on July 2, 1999, stating his belief that he had been treated differently and requesting that his treatment be investigated. He followed up with a memo on July 21 asserting that he had been the victim of discrimination and requesting an investigation. Mr. Abuan testified that the news of his internal discrimination complaint, which was

supposed to be kept confidential by Human Resources personnel, was disseminated throughout the company within a week. Mr. Hagens testified that he received a copy of the discrimination complaint the third week in July and also heard about it from Human Resources. Mr. Hagens discussed the matter with a variety of individuals. They included: Jack Waters, to whom Mr. Hagens answered; Mr. Mitchell, who answered to Mr. Hagens; Douglas Leas, who was a peer of Mr. Hagens; various people in Human Resources; Dan Caruso, the company vice president over Mr. Abuan's unit; and Brent Bourne, who subsequently became Mr. Abuan's supervisor. In conversations with Mr. Leas, Darrell Gallo of Human Resources, Mr. Mitchell, and Mr. Waters, Mr. Hagens criticized the fact that Mr. Abuan had filed the complaint.

Mr. Abuan never received a report from Human Resources on the results of the investigation into his discrimination complaint. Mr. Gallo, who was in charge of the investigation, testified that he spoke with Level 3 Vice President Van MacAtee, who stated that Mr. Abuan's performance was the reason for his removal as team leader of the NetExpert project. However, Mr. Gallo did not speak with any of the people whose names were provided by Mr. Abuan and who were in a position to evaluate his work on the project. Moreover, hand-written notes of an interview Mr. Gallo had with Mr. Hagens on July 26 indicate that Mr. Hagens told Mr. Gallo the NetExpert problems were "nothing regarding John's perf." Aplt.

Add. of Ex., doc. 13, at 40.

On July 14, Mr. Abuan received a memo directing him and other company employees to report to the provisioning department for a temporary assignment filling orders to activate service. It is undisputed that the provisioning department needed help in reducing its backlog and in bringing in the revenue generated by service activation, and that other employees with experience comparable to that of Mr. Abuan were also sent to help out. Mr. Abuan's first supervisor in provisioning, Shelli Hurd, who managed Mr. Abuan's work for three or four weeks, testified that after the backlog problem had been remedied, she spoke to the senior director, Deniece Stacy, about returning Mr. Abuan to his permanent position. Ms. Hurd suggested he should be the first to return because he had more experience than others and was higher up in the company. Ms. Stacy said no. When Ms. Hurd asked why, Ms. Stacy got very angry with her and said it was none of her business. Ms. Hurd also told Mr. Hagens that Mr. Abuan should go back to his original job. Ms. Stacy subsequently transferred Mr. Abuan to a different manager, Christi Dalitz, who assigned him to filing. Mr. Abuan remained in the provisioning department and was one of the last employees to be returned to his permanent position. Shortly after Mr. Abuan left provisioning, the contents of the file cabinets he had been filling were loaded into bags and shredded.

Mr. Abuan also presented the testimony of Mr. Leas, who developed a high

opinion of Mr. Abuan based on Mr. Abuan's work as the NetExpert team leader. Mr. Leas testified that the vice president to whom Mr. Abuan originally reported as team leader, Paul Roberts, also had a very high opinion of Mr. Abuan and the two had discussed Mr. Abuan's demotion. Mr. Roberts, who left the company, told Mr. Leas that a good part of the reason he was resigning was the unethical treatment of Mr. Abuan. Mr. Leas further testified that in late July 1999, after Mr. Abuan filed his discrimination charge with Human Resources, Mr. Leas had a discussion with Mr. Hagens to try to resolve the matter, requesting that Mr. Abuan be assigned to work for him. Mr. Leas testified that Mr. Hagens "was very agitated, mad, said to me that John had claimed discrimination and said, we are going to make an example of John for claiming discrimination, then he said we probably shouldn't be talking about this, so that's the end of the discussion." Supp. App. vol. III, at 535.

Mr. Abuan filed a federal EEO charge of discrimination, and the company received notice of the charge on September 30. Toward the end of September, while Mr. Abuan was still in provisioning, he was assigned to report to Brent Bourne, the subordinate of Mr. Abuan's prior supervisor, Mr. Mitchell. Mr. Abuan returned from provisioning October 12. Mr. Bourne had no prior exposure to Mr. Abuan's work and supervised him for about two months before giving Mr. Abuan a performance review on December 16, in which Mr. Bourne evaluated Mr.

Abuan's work for the entire previous year and gave him a poor rating. Mr. Bourne testified that his performance rating was based primarily on the prior quarter and reflected only input from Mr. Mitchell, who had allegedly received it from the provisioning department. Mr. Bourne did not discuss Mr. Abuan's performance with anyone in provisioning, nor did he discuss with anyone Mr. Abuan's work on the NetExpert project. As a result of his poor rating, Mr. Abuan received a smaller raise for the year, less than 100 percent of his bonus, and reduced stock options. The rating also froze Mr. Abuan's employee status, preventing him from taking another job within the company.

Hans Zeschin, who had worked under Mr. Abuan on the NetExpert project, was promoted in December to a senior management position and given his own group. After learning of Mr. Abuan's negative evaluation, Mr. Zeschin requested that Mr. Abuan be moved into his group. He subsequently observed Mr. Abuan's work for several months and described it as: "Same excellent work as always. Superior." Supp. App. vol. II, at 313. He further stated:

> John is very much of a coach and . . . Level 3 is very young, right, so there is a lot of young smart kids like me. . . .
> John has the ability to bring people together, consolidate ideas and lead. The architecture that he puts forth . . . allows, you . . . to think about the problems in a broader sense. . . . [I]t's having someone to unify the division and architect it out and bring these different pieces together that allows us to succeed. . . .
> [Mr. Abuan] works to resolve issues. . . .
> John is someone that's very easygoing, always wants to find out what's the best thing for the company. Has always been about what's

best for Level 3.

*Id.* at 314-15.

Mr. Zeschin had occasion to evaluate Mr. Abuan's performance and rated him as consistently exceeding objectives. He submitted the review to his superior, Mr. Mitchell, for final approval. Mr. Mitchell called Mr. Zeschin into his office and said he did not like the evaluation. Although Mr. Mitchell had not observed Mr. Abuan's performance or interacted with him and did not have the expertise to evaluate his work, he overrode Mr. Zeschin's evaluation and reduced Mr. Abuan's bonus and stock options by seventy percent. When Mr. Zeschin told Mr. Mitchell that he thought the override was inappropriate, Mr. Mitchell said he would handle it.

After Mr. Abuan received this performance review, a new vice president, Denzel Samuels, took over Mr. Zeschin's area. Mr. Samuels reviewed Mr. Abuan's file and placed him in a supervisory role in disaster recovery and business continuity, the position Mr. Abuan held at the time of trial.

Mr. Abuan presented evidence that as a result of this course of events, he was denied several promotions and the increased compensation packages that would have gone with them. As a result, at the time of trial Mr. Abuan was at a lower position and compensation level than he should have been.

The jury found in favor of Mr. Abuan on his age discrimination and

-10-

retaliation claims, and determined the age discrimination to be willful. It awarded Mr. Abuan $300,000 in back pay, $5,000,000 in compensatory damages, and $5,000,000 in punitive damages. In a post trial order, the district court held the jury's award of $300,000 in back pay to be against the weight of the evidence and remitted the amount to $56,252.25, remitted the liquidated damages under the ADEA to the same amount, and applied the $300,000 cap on punitive and compensatory damages imposed by the Civil Rights Act of 1991, 42 U.S.C. § 1981a(b)(3), in the case of a defendant who, as here, has more than 500 employees. The result was a total award of $412,504.50. The district court subsequently awarded Mr. Abuan front pay for two years in the amount of $245,160.

On appeal, Level 3 contends (1) the evidence was insufficient to support the finding of age discrimination, (2) the award of liquidated damages on that claim was improper, (3) the court committed prejudicial error in allowing the admission of a hearsay statement, (4) the court erred in failing to give two jury instructions, (5) Mr. Abuan's closing argument improperly prejudiced the jury, and (6) the court erred in awarding front pay. Level 3 also objects to the court's injunction directing Level 3 to refrain from retaliating against any witness who testified in the case. In his cross-appeal, Mr. Abuan argues the court erred in determining that the general layoff in which Mr. Abuan ultimately lost his job was not

-11-

discriminatory, in concluding that Mr. Abuan had rejected a post-trial job offer, and in calculating his front pay.  We address each issue in turn.

## II

### SUFFICIENCY OF EVIDENCE

Level 3 contends it was entitled to judgment as a matter of law and that the evidence is legally insufficient to support the jury's finding of age discrimination. In assessing whether the district court erred in denying Level 3's motion for judgment as a matter of law on this issue, we do not weigh the evidence, evaluate the credibility of witnesses, or substitute our conclusions for those of the jury. *See Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 549 (10th Cir. 1999).  We may reverse a jury determination only "if the evidence points but one way and is not susceptible to any reasonable inferences supporting" the nonmoving party. *Id.*

In making its argument, Level 3 focuses only on Mr. Abuan's demotion from team leader on the NetExpert program.[1]  It argues that Mr. Abuan failed in

---

[1] In denying Level 3's motion for summary judgment, in which it argued that Mr. Abuan had not established a prima facie case, the district court pointed out that Mr. Abuan's demotion and rebanding in the Spring of 1999 were not the only instances of alleged discriminatory demotion.  "Abuan was allegedly demoted in October of the same year, when he was placed under the supervision of Brent Bourne. . . .  As part of this reassignment, Abuan was 'loaned out' to perform menial clerical duties for the provisioning department at Level 3." Aplt. App. vol. I, doc. 8, at 100.

his burden of proof because he was not replaced, his former responsibilities in that position were divided among existing employees, and no single person took over the duties. In support of this assertion, Level 3 cites *Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 988 (10th Cir. 1996), and *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). For the following reasons, we conclude these cases are inapposite because they address the particular circumstances, not present here, that arise from a company's decision to institute a reduction in its workforce (RIF).

The Supreme Court made clear in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), that a district court need not grant judgment as a matter of law in favor of the defendant "when the plaintiff's case consists exclusively of a prima facie case of discrimination and sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action." *Id.* at 137. *Reeves* undermines Level 3's argument that it was entitled to judgment as a matter of law.

Asserting Mr. Abuan failed to make a prima facie case of discrimination, Level 3 urges the insufficiency of Mr. Abuan's evidence requires reversal of the jury's verdict. The jury, of course, does not apply the *McDonnell Douglas* framework in arriving at its verdict. Rather, the issue before the jury is "discrimination *vel non*." *U.S. Postal Serv. Bd. of Govervnors v. Aikens*, 460 U.S.

-13-

711, 715 (1983); *Reeves*, 530 U.S. at 143 (quoting *Aikens*). In *Aikens*, the Supreme Court explained that an appellate court's determination that a plaintiff failed to establish a prima facie case is not grounds for reversing a jury verdict in the plaintiff's favor. Thus, even if Level 3 were correct in asserting Mr. Abuan was not replaced and, as a result, cannot make a prima facie case of discrimination, we would not be bound to reverse the jury's finding that discrimination occurred. Level 3 would still be required to convince this court that, giving Mr. Abuan the benefit of all evidentiary inferences, Mr. Abuan failed to prove the ultimate issue of discrimination vel non.

We must thus assess the evidence to determine whether it was sufficient to establish that Level 3 discriminated against Mr. Abuan on the basis of his age. In making this assessment, we are unpersuaded by Level 3's argument that no inference of discrimination can be made where Mr. Abuan's position was eliminated and its duties divided among younger employees. In the RIF cases upon which Level 3 relies for this proposition, the defendant generally offers as a legitimate business reason for its action the need to eliminate the plaintiff's position as part of its reduction-in-force. *See, e.g.*, *Barnes*, 896 F.2d at 1468. The plaintiff then bears the burden of establishing that the reason given was a pretext for discrimination. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622-23 (10th Cir. 1994). One way a RIF plaintiff may show pretext is to present evidence that, in fact, his

-14-

job was not eliminated but remained "a single, distinct position." *Furr*, 82 F.3d at 988. Whether a position has been eliminated is relevant to the issue of discrimination in a RIF case because it bears on whether the defendant's proffered justification is pretextual.

The instant case does not involve a reduction in force. Level 3 asserted throughout the district court proceedings that the only reason for its decision to demote Mr. Abuan from his position as NetExpert team leader was his poor performance. Level 3 did not assert that Mr. Abuan's position was eliminated through a workforce reduction. Nor could it have done so. The evidence is undisputed that at the time of Mr. Abuan's demotion, Level 3 had grown from a handful of employees to about 1,000, and by the time of trial the company had grown to over 5,000. Level 3 was actively recruiting new employees during the entire period relevant to Mr. Abuan's claim.

Mr. Abuan presented evidence that he was qualified for the position of team leader of the NetExpert program, and that after he was demoted he was replaced by Mr. Mitchell, who was about thirty-five years of age. *See* Supp. App. vol. II, at 299-30. Evidence also tended to show that because Mr. Mitchell did not have the technical expertise required for the position, some of Mr. Abuan's work had to be assigned to another employee, Tom Hoople, who was thirty-four. *Id.* at 305-06. Mr. Hoople ultimately split his functions with his younger brother. *Id.* at 346-47.

This showing is more than adequate to raise an inference that Mr. Abuan's demotion was discriminatory, even though his prior work was divided up among three younger workers instead of being performed by a single replacement. This record as a whole is clearly sufficient to support the jury's determination that Mr. Abuan's demotion was the product of illegal age discrimination.[2]

## III

## LIQUIDATED DAMAGES

Under the ADEA, an employee may recover liquidated damages where his or her employer's violation of the statute is willful. 29 U.S.C. § 626(b). Level 3 raises two challenges to the award of liquidated damages on Mr. Abuan's age discrimination claim. First, the company argues that because the discriminatory demotion claim fails as a matter of law, the liquidated damages stemming from this claim must likewise be reversed. In view of our determination in Part II that Level 3 is not entitled to judgment as a matter of law on this claim, we reject this contention out of hand. Second, Level 3 argues that because liquidated damages are punitive in nature, they are duplicative of the punitive damages awarded to Mr. Abuan on his retaliation claim under Title VII. For the reasons set out below,

---

[2] In view of our disposition of this argument on appeal, Level 3's motion to strike Mr. Abuan's supplemental letter is denied as moot.

-16-

however, this issue has become moot.

In denying Level 3's motion to reduce damages based on the alleged duplicative nature of the punitive and liquidated damages, the district court explained that Title VII's statutory cap on compensatory damages rendered Level 3's argument irrelevant. The jury awarded Mr. Abuan 5,000,000 dollars in compensatory damages for his Title VII retaliation claim – well over the statutory cap of 300,000 dollars. If the district court had agreed that the jury's additional award of punitive damages under Title VII were duplicative of Mr. Abuan's liquidated damages award under ADEA, it would have eliminated the Title VII punitives. But Mr. Abuan would still be entitled to the statutory maximum for compensatory damages under Title VII, as well as back pay and liquidated damages under ADEA. The "reduced" award would thus mirror the award Mr. Abuan actually received. Level 3's argument that the district court's analysis renders Title VII's statutory cap meaningless ignores the fact that the cap applies only to the Title VII award. Regardless of the court's disposition of Level 3's contention as to double-recovery, Mr. Abuan is entitled to the statutory maximum on his Title VII claim for compensatory damages plus back pay and liquidated damages under ADEA.

**IV**

**EVIDENTIARY RULING**

Level 3 contends the district court committed prejudicial error in permitting Mr. Abuan's witness, Douglas Leas, to testify to statements made by Paul Roberts, Mr. Abuan's supervisor on the NetExpert program and a corporate vice president. Mr. Leas testified that Mr. Roberts said a substantial reason for his resignation was the unethical treatment of Mr. Abuan. Mr. Roberts made his remarks at his going-away luncheon, while he was still employed at Level 3. The bench conference on Level 3's motion to exclude these statements indicates the district court believed they were admissible under FED. R. EVID. 803(6), which provides an exception to the hearsay rule for business records. On appeal, Level 3 maintains this evidence is not admissible under that rule because the evidence consists of oral statements. Mr. Abuan, on the other hand, asserts the statements are not hearsay at all under Rule 801(d)(2)(D), which defines as non-hearsay "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED. R. EVID. 801(d)(2)(D).

Evidentiary rulings are reviewed for abuse of discretion. *United States v. Knox*, 124 F.3d 1360, 1363 (10th Cir. 1997). Appellate review is especially deferential with respect to rulings on the admission of hearsay evidence. *Id. See also Boren v. Sable*, 887 F.2d 1032, 1033 (10th Cir. 1989). Moreover, this court

-18-

may affirm the admission of statements improperly characterized by the district court as an exception to the hearsay rule where the record indicates the evidence was actually non-hearsay admissible for its truth. *See Knox*, 124 F.3d at 1363-64 & n.1 (citing cases).[3]

Mr. Abuan contends the statements fall within Rule 801(d)(2)(D) because Mr. Roberts was a high corporate officer, the remarks were within the scope of his own employment while discussing the treatment of his subordinate, and they were made while Mr. Roberts was still an agent or employee of the company. Level 3 argues that the law defines scope of employment strictly, and that the statement was not within the scope of Mr. Roberts' employment because he did not participate in the employment decision at issue. Level 3 does not cite any Tenth Circuit authority in support of its argument.

The admission of this evidence is controlled by our analysis in *Rainbow Travel Service v. Hilton Hotels Corp.*, 896 F.2d 1233 (10th Cir. 1990). The

---

[3] Level 3 erroneously contends on appeal we should reject Mr. Abuan's position because he did not argue at trial that the evidence was admissible as non-hearsay. As this court observed in *United States v. Knox*, 124 F.3d 1360 (10th Cir. 1997), under similar circumstances, "'[a]n appellate court will affirm the rulings of the lower court on any ground that finds support in the record, even where the lower court reached its conclusions from a different or even erroneous course of reasoning.'" *Id.* at 1362 (quoting *Keyes v. School Dist. No. 1*, 521 F.2d 465, 472-73 (10th Cir. 1975)). "'[W]e should hardly be warranted in reversing for the admission of evidence simply because the judge did not place his ruling on the ground that would most readily have supported it'." *Id.* (quoting *United States v. Ross*, 321 F.2d 61, 69 (2d Cir. 1963)).

plaintiff in that case was a travel service that had arranged for clients to stay at the Fontainebleau Hotel in Miami Beach. It sued the hotel chain owning the Fontainebleau for breach of contract and fraud when the Fontainebleau was overbooked and the chain had to accommodate the clients at a less desirable hotel. The district court allowed testimony of some of the clients, who recited statements made by a shuttle bus driver employed by the hotel to shuttle customers from the Fontainebleau to the other hotel. The driver told the customers his job was to transport guests who had been bumped from the Fontainebleau and to try to keep them happy. *Id.* at 1242. The defendant objected on the ground that the bus driver was not qualified to make statements concerning the hotel's reservation practices. The district court ruled the testimony was admissible under Rule 801(d)(2)(D) "because it was a statement by a party's agent concerning a matter within the scope of his agency." *Id.* This court upheld the admission, pointing out the statements were "all related to the scope of his employment with the hotel." *Id.*

Given our ruling in *Rainbow Travel* that a shuttle bus driver's statements concerning hotel reservation practices fall within Rule 801(d)(2)(D), so does a vice president's statements concerning his company's unethical treatment of a direct subordinate. The admission of these statements is not grounds for reversal.

**V**

# JURY INSTRUCTIONS

Level 3 argues that the district court erred in failing to give the jury two instructions, one describing the conduct qualifying as an adverse employment action and one telling the jury the legal standard applicable to conflicting testimony on Mr. Abuan's performance. Mr. Abuan counters that Level 3 neither objected at the conference on jury instructions nor timely proffered the instructions it claims were erroneously omitted, and that the omission does not constitute plain error.

"No party may assign as error . . . the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." FED. R. CIV. P. 51. In this circuit, to comply with Rule 51 a party must both proffer an instruction and make a timely objection to the refusal to give a requested instruction. *Giron v. Corr. Corp. of America*, 191 F.3d 1281, 1288-89 (10th Cir. 1999). A party does not "satisfy the requirements for Rule 51 by merely submitting to the court a proposed instruction that differs from the instruction ultimately given to the jury." *Id.* at 1289 (internal quotation omitted).

The record does contain Level 3's second submission of proposed jury instructions, *see* Aplt. App. vol. I, doc. 5, which includes the proposed instructions

at issue, *see id.* at 62-63.[4]  The record is clear, however, that Level 3 did not

proffer these instructions at the instruction conference or object at that time to the

district court's failure to include them.  Level 3 maintains this failure does not

constitute a waiver because it had previously raised the issues in a motion for

summary judgment and the district court rejected its position.  In so doing, Level 3

attempts to invoke the "futility" exception to Rule 51, under which a "litigant is

excused from complying with the strict objection requirement of Rule 51 if the

district court is aware of the party's position and it is plain that further objection

would be futile, where [the] litigant's position [was] clearly made to the district

court." *Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1370 (Fed. Cir. 2002)

(quoting 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 51.12[2][a],

at 51-40.2 to 51-41 (3d ed. 1997), and citing 9A CHARLES ALLEN WRIGHT &

ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2553, at 441 (2d ed.

1986)) (internal quotations omitted).

 This court applied the futility exception in *Asbill v. Housing Authority of the

Choctaw Nation of Oklahoma*, 726 F.2d 1499 (10th Cir. 1984).  In that case,

although the party had not voiced during the instruction conference the specific

---

 [4] Although these proposed instructions are marked "received" on Feb. 26, 2001, they bear no indication that they were in fact filed with the court, or that the court refused to give them or when the court did so.  In contrast, Level 3's proposed jury verdict form is file stamped.  *See* Aplt. App. vol. I, doc. 6.

objection he was raising on appeal, we did not consider the matter waived. In so holding, we pointed out that the party did not raise the issue at the conference out of knowledge that the court had previously rejected its position at least four times before and during trial. *Id.* at 1502 n.3. We concluded under these circumstances that the party's position had been made clear to the court and further objection would have been futile.

The record in this case reveals no such circumstances. Level 3 contends it made known to the court in its summary judgment materials its position that the two instructions were required. In those pleadings, Level 3 asserted Mr. Abuan had failed to establish a prima facie case of Title VII retaliation because he did not present any evidence he had suffered an adverse employment action. In denying summary judgment, the district court pointed to evidence that Mr. Abuan was demoted when he was assigned to report to Mr. Bourne and when he was assigned to perform menial clerical duties, and concluded that genuine issues of material fact precluded the grant of summary judgment for Level 3. The summary judgment proceedings thus dealt only with whether Level 3's treatment of Mr. Abuan was or was not adverse employment action as a matter of law. As such, they did not clearly inform the court of Level 3's position that its jury instruction defining "adverse employment action" was necessary. The court's ruling denying summary judgment cannot, in these circumstances, be construed as making plain

its position rejecting the need for such an instruction.

> In support of its summary judgment motion Level 3 also argued that
>
> where poor job performance is the reason cited by the defendant for its actions, the plaintiff cannot rebut that as a legitimate, nondiscriminatory reason with only evidence of his own belief that his work was satisfactory. For, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiffs subjective evaluation of her own relative performance."

Aplt. Supp. App., doc. 1, at 17 (citation omitted). In so doing, Level 3 claimed a plaintiff's mere conjecture that an employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment. The district court rejected this argument, stating its belief that fact issues existed as to whether "Mr. Abuan's reassignments during three years at Level 3 constituted demotions motivated by discriminatory animus." Aplt. App. vol. I, doc. 8, at 100. Level 3's assertion that the evidence of pretext was insufficient as a matter of law cannot be construed as giving the court clear notice of its position that an instruction on evaluating evidence of Mr. Abuan's performance was necessary. And, of course, the court's denial of summary judgment is not a plain indication that it would not give a jury instruction on the issue. Accordingly, we conclude that the futility exception, a "'rarely' applied 'narrow exception' to Rule 51" should not be employed in this case. *Cadena v. The Pacesetter Corp.*, 224 F.3d 1203, 1212 (10th Cir. 2000) (citing *Glasscock v. Wilson Constructors, Inc.*, 627 F.2d 1065, 1067-68 (10th Cir. 1980)).

-24-

We therefore review only for plain error the court's failure to give the two instructions at issue. Under this standard, Level 3 must show "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." *Beaudry v. Corr. Dep't of America*, 331 F.3d 1164, 1168 (10th Cir. 2003) (per curiam). We may only reverse in an exceptional circumstance, where the error was patently erroneous and prejudicial and where fundamental injustice would otherwise occur. *Barber v. T.D. Williamson, Inc.*, 254 F.3d 1223, 1227 (10th Cir. 2001).

Level 3's proposed instruction on evaluating Mr. Abuan's performance states, ungrammatically, as follows: "In order to find that plaintiff was discriminated against because of an unfavorable personnel evaluation, you must consider only plaintiff's managers' perception of the employee's performance. Neither plaintiff's self-evaluation of his own performance nor any evaluations of plaintiff's performance by his co-employees." Aplt. App. vol. I, doc. 5, at 62. The proposed instruction is drawn from *Furr*, 82 F.3d at 988, but it misstates the holding in that case. *Furr* addressed only the "plaintiff's subjective evaluation" of his own performance relative to that of other employees who were not eliminated in the RIF. *Id. Furr* does not support the notion that evidence from Mr. Abuan's co-workers as to his performance is irrelevant. Level 3 is correct to assert that the ultimate issue before the jury was Mr. Abuan's supervisors' appraisal of his

-25-

performance. Mr. Abuan's co-workers' assessment of his work, however, is clearly probative of pretext. Yet under Level 3's proposed instruction most evidence of pretext would become irrelevant once a defendant has stated that its action was based on its own evaluation of the plaintiff's performance. This result is legally insupportable. Because this instruction was an incorrect statement of the applicable law, the failure to give it was not error at all.

We likewise see no merit in Level 3's argument that the failure to give an instruction defining adverse employment action is grounds for reversal. The proposed instruction stated that an adverse employment action is one in which a "manager took action against plaintiff in a way that affected his compensation or job duties." Aplt. App. vol. I, doc. 5, at 63. In this circuit, conduct constitutes adverse employment action when it results in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1241 (10th Cir. 2002). This court, in recognition of the remedial nature of Title VII, employs a liberal definition of adverse employment action and a case-by-case approach.[5] *Stinnett v. Safeway*, 337 F.3d 1215, 1217 (10th Cir. 2003). Even if we held the failure to instruct on the

_____

[5] Of course, the challenged action must rise above "a mere inconvenience or an alteration of job responsibilities." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).

definition of adverse employment action was error, and further held the error was plain and prejudicial, Level 3 would still shoulder "the heavy burden of demonstrating fundamental injustice." *Cadena*, 224 F.3d at 1212 n.6 (quoting *Medlock*, 164 F.3d at 553). Upon a thorough review of the record, particularly the evidence set out elsewhere in this opinion, we are convinced the district court's failure to define adverse employment action for the jury did not result in fundamental injustice. *See id.* Accordingly, reversal is not warranted.

## VI

## CLOSING ARGUMENT

Level 3 asserts that reversal is required because of improper closing argument by Mr. Abuan's counsel. Level 3 emphasizes that counsel referred to Level 3's failure to respond to the EEOC charge and appealed to the jury's sympathy, invoking issues of poverty and race. Level 3 also cites numerous instances in which counsel allegedly misstated the evidence, argued inferences not supported by the evidence, and misstated the law. But Level 3 made only two objections to the closing argument: an objection to counsel's reference to his own humble beginnings and an objection to counsel's statements of personal belief which Level 3 does not address on appeal. The district court sustained both objections.

The decision on whether counsel's misconduct at trial was so egregious as to require retrial is left largely to the discretion of the district court. *Mason*, 115 F.3d at 1456. We reverse only upon a clear abuse of that discretion. *Id.* "[A] new trial may be required only if the moving party shows that it was prejudiced by the attorney misconduct." *Id.*

The only allegation of counsel misconduct to which Level 3 objected at trial was counsel's reference to his own early days of poverty. In denying Level 3's motion for a new trial on this ground, the district court reviewed the closing arguments and found that the asserted impropriety was "not a significant portion of counsel's closing argument," and that "the jury was properly instructed that the arguments of counsel were not to be considered as evidence." Aplt. App. vol. III, doc. 28, at 568. The court accordingly concluded that Level 3 was not prejudiced by the remark. We find no abuse of discretion here. As the district court pointed out, we presume the jury followed the instruction cautioning that counsels' arguments are not evidence. *Gardner v. Chrysler*, 89 F.3d 729, 737 (10th Cir. 1996). Moreover, upon objection the court cautioned the jury that there was no evidence to support counsel's argument. "The timely objection and the sustaining of the objection certainly detracts from a conclusion of prejudice." *United States v. Preston*, 634 F.2d 1285, 1293 (10th Cir. 1980).

After Mr. Abuan filed his discrimination charge with EEOC, EEOC

requested a response from Level 3. Level 3 failed to reply. Counsel referenced this failure in closing argument, and Level 3 did not object.[6] In denying Level 3's post-trial motion for a new trial on the ground of attorney misconduct, the district court rejected Level 3's argument that it was entitled to a new trial because counsel had violated the court's motion in limine with respect to the EEOC charge. In so doing, the court observed that

> [a]ny prejudice incurred by the Defendant was surely the result of its own maneuvers. Defendant would have been better off to let the issue lie as directed by the Court's order on Defendant's motion in limine. Accordingly, the Defendant opened the door to the testimony about which it now complains.

Aplt. App. vol. III, doc. 28, at 565. The record supports the district court's assessment of the circumstances. Level 3 "moved for the admission of Plaintiff's exhibits which contained two documents pertaining to the EEOC proceedings." *Id.* Mr. Abuan alleged, and the district court apparently concluded, Level 3's motion was an attempt to create the impression it "fully cooperated with the EEOC's investigation." *Id.* We see no ground for reversal in counsel's reference in closing argument to evidence that Level 3 did not cooperate. In any event, Level 3 has not demonstrated substantial injustice, a showing mandated by its failure to

---

[6] Not only did Level 3 fail to object during closing argument, Level 3's motion for new trial was directed to counsel's elicitation of testimony on the matter at trial, while its argument on appeal addresses counsel's reference to that evidence in closing argument.

make a timely objection.

Finally, we turn to Level 3's remaining list of alleged improprieties. Our review of the record indicates that counsel's misconduct was not as pervasive or as alarming as Level 3 contends. Instead, as in other hard-fought jury trials, counsel's closing argument "played a small role in a trial with many legitimate disputes between counsel over the relevance of several factual matters and the boundaries of orders in limine." *Mason*, 115 F.3d at 1456. Moreover, the evidence supporting the jury's determinations was substantial and in some instances quite powerful. Under these circumstances "we have no reason to believe that a different result would have occurred in the absence of the misconduct." *Id.* Accordingly, a new trial is not warranted.

## VII

## FRONT PAY

Shortly after the trial of this case, Mr. Abuan was laid off and he asked the district court to award him front pay as a result. After a hearing, the court awarded Mr. Abuan front pay, covering a period beginning with his November 2001 lay-off and continuing two years thereafter, in an amount based on the salary he was earning at the time he lost his job. Level 3 challenges the district court's award, contending Mr. Abuan is not entitled to front pay as a matter of law

because he rejected the company's post-trial offer of a position substantially equivalent to the one he was denied or lost and because he was subsequently laid off for nondiscriminatory reasons. Mr. Abuan maintains the district court's award was supported by evidence showing that the hostility generated by the lawsuit made reinstatement infeasible and that he was made vulnerable to layoff, when he otherwise would not have been, by the company's earlier adverse actions in demoting him.

"[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). Front pay is an appropriate remedy under both the ADEA, *see Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 637 (10th Cir. 1989), and Title VII, *see Pollard*, 532 U.S. at 849-50. Although reinstatement is the preferred remedy and should be ordered whenever it is appropriate, it is not always a viable option. "In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement." *Id.* at 846. In such cases an award of front pay as a substitute for reinstatement is "a necessary part of the 'make whole' relief mandated by Congress . . . ." *Id.* at 850.

This court has recognized that front pay may be appropriate where an employer's extreme hostility renders a productive and amicable working relationship impossible, or "if the employer-employee relationship has been irreparably damaged by animosity caused by the lawsuit." *Anderson*, 861 F.2d at 638. "Under such circumstances, an award of future damages in lieu of reinstatement furthers the remedial purposes of the ADEA by assuring that the aggrieved party is returned as nearly as possible to the economic situation he would have enjoyed but for the defendant's illegal conduct." *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1173 (10th Cir. 1985). "If this were not the case, an employer could avoid the purpose of the Act simply by making reinstatement so unattractive and infeasible that the wronged employee would not want to return." *Id.*

Whether reinstatement or front pay is the appropriate remedy for employment discrimination is a matter committed to the discretion of the district court. *See James v. Sears, Roebuck & Co.*, 21 F.3d 989, 997 (10th Cir. 1994). "In determining whether, and how much, front pay is appropriate, the district court must attempt to make the plaintiff whole, yet the court must avoid granting the plaintiff a windfall." *Mason*, 115 F.3d at 1458 (internal quotation omitted). "Because determining a front pay award requires the district court to predict future events and consider many complicated and interlocking factors, we review such

awards with considerable deference, reversing only for an abuse of discretion."
*Id.*

At the time of trial in June 2001, Mr. Abuan was still employed at Level 3 as a supervisor, although he presented evidence that, due to his earlier failure to receive promotions, he was at a lower position and salary level than he would have been absent Level 3's alleged illegal acts. Level 3's economic situation was deteriorating in June 2001, however, and the company instituted a layoff that month in which it determined Mr. Abuan's position to be extraneous and eliminated it. After beginning to implement Mr. Abuan's termination, the company decided instead to retain him in order to avoid conflict with the court's order enjoining retaliatory discharges. Level 3's financial circumstances continued to decline and in November 2001 the company again instituted a layoff as part of a company-wide downsizing, this time eliminating Mr. Abuan's position.

The month before Mr. Abuan was laid off, Level 3 offered him a new position through a recently-hired vice president, Elbert Davis. At the hearing on front pay, Level 3 presented evidence that Mr. Davis was hired to build a network management system to monitor network operations. Mr. Davis testified that as of the front pay hearing, thirty-one people had transferred into his organization, two new people had been hired, and he expected to hire six more. Mr. Davis had interviewed Mr. Abuan, discussed a possible position for him in the organization,

and made him an offer.  At a second meeting, Mr. Abuan and Mr. Davis discussed the offer and Mr. Abuan requested that it be put in writing.

Mr. Abuan responded to the written offer with a letter expressing his doubt as to whether the position was "a real permanent job."  Aplt. Add. of Ex., doc. 40, at 129.  Mr. Abuan stated his concern that, in view of the large number of layoffs then underway, the position would be temporary.  He further criticized the offer because it provided virtually no salary increase, stating that it "would by no means even begin to rectify the damage that the company has caused to me over the past two years," and that if the company chose to place him in such an insecure job he would "view it as continuation of the pattern of retaliation" against him.  *Id.* Although Mr. Abuan offered to discuss the matter further, he suggested that the parties' attorneys and a magistrate judge should also be present at any further discussions.[7]

Mr. Davis testified Mr. Abuan's letter indicated to him Mr. Abuan did not trust the job to be a real one.  Mr. Davis viewed the letter as an unusual and abnormal response to an offer, and believed that the company's legal department should be involved.  After conferring with that department, Mr. Davis responded

---

[7] Mr. Abuan presented evidence he had told Mr. Davis during their discussions that the project Mr. Davis was hired to implement was virtually the same as the NetExpert project Mr. Abuan had headed.  Mr. Abuan asserted it was reasonable for him to doubt the validity of the new position when the company had already demoted him from that work previously.

to Mr. Abuan, telling him his letter was viewed as a rejection. Mr. Davis testified the letter "sent very bad signals to me regarding this work relationship that I could have with this individual and this individual on my team." Supp. App. vol. IX, at 2107. Although another exchange of letters took place, their tone was increasingly hostile and, while Mr. Davis testified the position remained open, Mr. Abuan did not fill it.

The district court determined that reinstatement would not be an appropriate remedy in view of the continuing hostility and conflict resulting from the lawsuit. In so doing, the court noted Mr. Abuan's belief that his future at Level 3 was dim due to the company's persistent animosity, and pointed out that "[w]hether or not this perceived animosity is real, it has destroyed Plaintiff's ability to be an effective member of Defendant's workforce." Aplt. App. vol. III, doc. 36, at 678.

Our review of the record convinces us the court did not abuse its considerable discretion in concluding that reinstatement was not feasible in this case. The testimony at trial and at the post-trial front pay hearing, as well as the pleadings, appellate briefs, and papers filed after oral argument, demonstrate hostility and animosity between the parties that, as the district court noted, have even carried over to a conflict between Mr. Abuan's counsel and Level 3 executives who live in his neighborhood. Mr. Abuan's perception that the company remained so hostile to him that his future there was hopeless is not

unreasonable given the evidence supporting the jury's determination that Level 3 set out to make an example of him for complaining about discrimination, demoted him and placed him in menial duties, and was allegedly still looking for a way to get rid of him after the jury verdict notwithstanding the court's injunction barring retaliation against trial witnesses. This evidence also renders specious Level 3's contention that Mr. Abuan created the hostile environment. The facts surrounding Level 3's treatment of Mr. Abuan, together with its litigation strategy, are persuasive examples of animosity on Level 3's part resulting from Mr. Abuan's prosecution of this litigation. *See Feldman v. Philadelphia Hous. Auth.*, 43 F.3d 823, 832 (3d Cir 1995).

Level 3 nonetheless argues that Mr. Abuan's refusal to accept Mr. Davis' job offer forecloses an award of front pay. We disagree. Even an unconditional and comparable job offer does not prevent the award of front pay in lieu of reinstatement when hostility renders reinstatement inappropriate. *See id.* (when trial court does not abuse discretion in rejecting reinstatement due to hostility, effect of job offered during litigation need not be addressed). Indeed, Level 3's argument would force a successful plaintiff into the untenable position of choosing between an irreparably damaged employment relationship with a hostile employer

or foregoing the remedy that would make him whole.[8]

Level 3 also argues that front pay is barred because it allegedly established that Mr. Abuan would have been laid off in the November downsizing in any event. Mr. Abuan counters that absent Level 3's illegal conduct, he would not have been demoted to a position vulnerable to layoff, pointing to evidence that the people with whom he worked on NetExpert had all been promoted and none of them had been laid off. In response, Level 3 points out that most of the people in that unit were now reporting to Mr. Davis, and contends that had Mr. Abuan accepted Mr. Davis' offer he too would have remained employed. Level 3 reiterates its argument that Mr. Abuan's refusal to take the job bars his entitlement to front pay.

Again, we disagree. Level 3's argument overlooks the fact that the hostility and animosity resulting from Mr. Abuan's decision to litigate his discrimination

---

[8] Level 3 cites only *Konstantopoulos v. Westvaco Corp.*, 893 F. Supp. 1263 (D. Del. 1994), in support of its proposition that a plaintiff who refuses an offer to be reinstated into a hostile working relationship is not entitled to front pay. There the plaintiff established a hostile work environment due to sexual harassment for a particular period that had ended by the time she returned to work from a medical leave of absence. The court agreed with the plaintiff that reinstatement was not feasible, *id.* at 1279, but also concluded that the plaintiff's inability to work at that particular job was "not necessarily related to defendant's conduct," *id.* at 1278. The court denied the plaintiff an award of front pay because the plaintiff had no legitimate reason for failing to seek employment *elsewhere*. The facts in *Konstantopoulos* are thus totally distinguishable from those in the instant case.

claims is a valid ground for the district court's determination that reinstatement was not feasible. Level 3's illegal conduct as found by the jury placed Mr. Abuan in a position vulnerable to layoff, and the company's hostile and retaliatory response to his discrimination charge rendered reinstatement inappropriate. We will not frustrate the required make-whole remedy by allowing Level 3 to defeat an award of front pay through illegal conduct and hostility. In sum, we reject Level 3's argument that front pay is barred as a matter of law.

In his cross-appeal, Mr. Abuan raises three issues pertaining to the district court's award of front pay. First, he contends the district court erred in concluding that he had rejected the job offer from Mr. Davis, arguing Mr. Davis had instead taken the offer off the table. In view of our rulings on front pay, we need not address this argument.

Mr. Abuan also challenges the court's determination that the general layoff in November in which he lost his job was not done for discriminatory reasons. Although Mr. Abuan does not take issue with the court's ruling that the overall layoff was not discriminatory, he believes the court's order could be read to reject his argument that the layoff nonetheless had a discriminatory impact on him. We do not think the court's language is subject to such an interpretation. The district court recognized that front pay cannot be awarded when an employee would have subsequently been terminated for legitimate non-discriminatory reasons. The court

also acknowledged Mr. Abuan's argument that but for the discrimination he would not have been vulnerable to the otherwise nondiscriminatory layoff, and awarded Mr. Abuan front pay for two years, a period that extended beyond the layoff at issue. In so doing, the court clearly agreed with Mr. Abuan that he was made vulnerable to layoff by Level 3's illegal acts, but concluded that, given the economic climate, he could well be legitimately laid off after the two-year period. The court also considered Mr. Abuan's education and experience in assessing the length of time a person with Mr. Abuan's credentials would need to find another position. We see no abuse of the court's discretion in its evaluation of these circumstances.

Finally, Mr. Abuan contends the district court erred in calculating his front pay award. The court ordered Level 3 to pay a front pay award for a two-year period beginning with Mr. Abuan's November 2001 lay-off. Mr. Abuan's salary at the time of his lay-off served as the basis of the court's calculation of the award. Mr. Abuan asserts that in using his November 2001 salary the court failed to take into account the evidence at trial that, as a result of Level 3's illegal conduct, he had failed to receive promotions and the corresponding increases in compensation which he would otherwise have been given. In selecting Mr. Abuan's most recent salary as the basis for its front pay award, the district court pointed to evidence that his salary "was significantly above that of other individuals in comparable

positions" at Level 3.  Aplt. App. vol. III, doc. 36, at 684.  The court also noted that Mr. Abuan's salary would have been greater had he accepted Mr. Davis' offer, and declined to speculate on whether Mr. Abuan would have advanced at the same rate as the people with whom he began his employment.

We believe the court abused its discretion in failing to adjust Mr. Abuan's front pay to reflect the effects of Level 3's illegal conduct on his failure to receive promotions.  The jury's award of back pay clearly reveals its finding that Mr. Abuan had suffered a loss in salary as a result of Level 3's retaliation.  The fact that his salary at the time of trial was above that of others in positions comparable to the job he held then is irrelevant if the evidence indicates he would have been in a higher position absent Level 3's retaliation.  Mr. Abuan's failure to accept Mr. Davis' offer is also irrelevant given the court's conclusion, which is amply supported by the evidence, that reinstatement was not feasible.  Finally, taking into account the effect of Level 3's illegal acts on Mr. Abuan's rate of promotion does not require speculation; evidence at trial credited by the jury indicates that Mr. Abuan was in fact held back due to Level 3's acts.

"[T]he mere fact that damages may be difficult of computation should not exonerate a wrongdoer from liability.  The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Prudential Sav. & Loan*, 763 F.2d at 1173

(internal quotations omitted).  Accordingly, we remand for further proceedings on the amount of front pay.  On remand, the district court should also award Mr. Abuan reasonable attorney's fees as the prevailing party on appeal.  *See Hoyt v. Robson Cos. Inc.*, 11 F.3d 983, 985 (10th Cir. 1993).

## VIII

## THE INJUNCTION

Finally, we turn to Level 3's argument seeking dissolution of the district court's order enjoining Level 3 from retaliating against any of the witnesses who testified at trial.  We review the issuance of an injunction for an abuse of discretion.  *See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1555 (10th Cir. 1993).

The district court issued its order during trial after one of the witnesses who was still employed at Level 3 testified she was told that the testimony transcripts would go to Level 3's CEO and founder.  At that point, the court directed the witness to tell the truth as she had sworn to do and she assured the court that she would do so.  The court subsequently viewed this situation as raising the possibility of recriminations from testifying at the trial and accordingly entered an order directing Level 3 management to "refrain from any type of redress or recriminations of any kind against any of the witnesses who testify in this case."

Supp. App. vol. III, at 462. That same day, defense counsel took issue with the suggestion that the circumstances raised the possibility of recriminations. In response the court stated: "Now she didn't say that she was threatened with recrimination or retaliation. But I deduced that. That it might be. And it's a veiled threat. . . . But that's what we are talking about here. We are talking about a vicious type of corporate politics which is deplorable." *Id.* at 515-16.

At a later point near the end of the trial, the district court denied Level 3's motion to reconsider the restraining order, stating:

> And my point is this; I don't know that that restraining order is necessary, but I do know that [the witness] says that [the CEO] was going to read the transcript. I believe her. And I do know this; that there is a lot of Level 3 employees who are or may be witnesses in this case. What I want to get at is the truth of the matter, and I don't want people to feel that they have to hold back anything or they have to hide the ball or do something like that. I want them to be able to testify freely, without fear of recrimination or retaliation, and that's my purpose is issuing the order . . . .

Supp. App. vol. IV, at 921. Level 3 again requested the court to dissolve the restraining order in a post-trial motion and the court again refused to do so.

We see no abuse of discretion in the court's decision to leave the order in place. The jury found that Level 3 had retaliated against Mr. Abuan for pursuing his discrimination claims, and testimony by other Level 3 employees supported the reasonable inference that the company had retaliated against them for conduct that Level 3 viewed as contrary to its interest. In giving their testimony, witnesses may

have relied on the assurance provided by the order that they would not suffer adverse employment consequences.  Although Level 3 contends the order is inappropriate because the trial witnesses would have an adequate remedy at law and because the order deprives Level 3 of the benefits of conciliation, these arguments ring hollow given the unnecessarily protracted and hostile litigation in this case and the undisputed fact that Level 3 chose not to participate in conciliation after Mr. Abuan filed his Title VII charge.  Accordingly, we see no ground for disturbing the district court's decision to maintain the order.

The judgment is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings on front pay and appellate attorney's fees.